EN EL TRIBUNAL SUPREMO DE PUERTO RICO

| | |
|---|---|
| José M. Álvarez de Choudens y otros<br><br>    Demandantes-recurridos<br><br>vs.<br><br> Germán Rivera Vázquez y otros<br><br>    Demandados-peticionarios | Certiorari<br><br>2005 TSPR 85<br><br>164 DPR ____ |

Número del Caso: CC-2002-571

Fecha: 17 de junio de 2005

Tribunal de Apelaciones:

Circuito Regional VI de Caguas/Humacao/Guayama

Juez Ponente:

Hon. Jorge L. Escribano Medina

Abogados del Recurrido:

Lcdo. Nector Robles Abraham

Lcdo. Reinaldo Rosario Agosto

Abogado del Peticionario:

Lcdo. Israel Delgado Ramos

Lcdo. Michel J. Godreau

Materia: Acción Civil

Este documento constituye un documento oficial del Tribunal Supremo que está sujeto a los cambios y correcciones del proceso de compilación y publicación oficial de las decisiones del Tribunal. Su distribución electrónica se hace como un servicio público a la comunidad.

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

José M. Álvarez de Choudens
y otros

    Demandantes-recurridos

       vs.             CC-2002-571     CERTIORARI

Germán Rivera Vázquez
y otros

    Demandados-peticionarios


OPINIÓN DEL TRIBUNAL EMITIDA POR EL JUEZ ASOCIADO SEÑOR REBOLLO LÓPEZ

San Juan, Puerto Rico, a 17 de junio de 2005

Para principios del año 1993, José Álvarez de Choudens, Edwin Córdova Torres y Armando Passalacqua Alonso mostraron interés en adquirir unos cinco mil (5,000) metros cuadrados de terreno de una finca principal, de mayor cabida, ubicada en el Barrio Montones del Municipio de Las Piedras, con el propósito de establecer y construir dos establecimientos de comida rápida en dicho predio. Luego de sostener conversaciones a esos efectos con el Sr. Germán Rivera Vázquez, dueño de la referida finca, las partes otorgaron un contrato de opción de compra el 6 de julio de 1993.

Conforme el contrato otorgado, el precio total de la compra y venta sería de $600,000. El precio pactado por la opción fue $60,000, a ser pagados de la siguiente manera: (a) $20,000 al firmar el contrato de opción; (b) $20,000 el día 30 de septiembre de 1993; y (c) $20,000 al conseguirse los permisos para la segregación del terreno.[1]

Los compradores, además, venían en la obligación de gestionar los permisos ante la Junta de Planificación para el cambio de zonificación de zona industrial a zona comercial. [2] Una vez obtenido el referido cambio de zonificación, con el propósito de poder llevar a cabo el contrato de compraventa, el señor Rivera Vázquez vendría obligado a hacer los trámites ante la Administración de Reglamentos y Permisos (A.R.P.E.) para obtener el permiso de segregación de los cinco mil (5,000) pies cuadrados de terreno de la finca principal.

El 14 de octubre de 1994, los señores de Choudens, Córdova y Passalacqua, luego de haber pagado $40,000 del contrato de opción, obtuvieron a nombre del señor Rivera Vázquez una consulta de ubicación de la Junta de Planificación.[3] En virtud de la referida consulta, se logró el cambio de zonificación del terreno de zona industrial a

---

[1] Los $60,000 del contrato de opción formaban parte de los $600,000.

[2] Este cambio de zonificación era necesario para establecer los negocios de comida rápida en el terreno.

[3] El número de consulta es el 94-50-0124-JPU.

zona comercial. Conforme a ello, Rivera Vázquez procedió, entonces, a obtener los permisos correspondientes y a llevar a cabo la segregación del terreno objeto del contrato de opción.[4]

Una vez terminadas todas las gestiones para llevar a cabo la segregación, el señor Rivera Vázquez le requirió a los demandantes recurridos el pago de los restantes $20,000 del contrato de opción para poder culminar con la compra del terreno. Los demandantes recurridos confrontaron problemas económicos que no le permitieron cumplir con el pago del último plazo de $20,000.

En el entretanto, el 19 de abril de 1995, de Choudens, Córdova y Passalacqua suscribieron una carta contrato con Caribbean Restaurant, Inc. (en adelante Burger King) con el propósito de establecer un negocio de comida rápida en el terreno de Rivera Vázquez. De igual forma, el 3 de mayo de 1995, hicieron lo propio con Southamerican Restaurant Corp. (en adelante Church´s).

Conforme a los términos establecidos en dichas cartas, "Burger King" y "Church´s" se comprometían con de Choudens, Córdova y Passalacqua a que, una vez ellos adquirieran el terreno del señor Rivera Vázquez y prepararan los planos de construcción con los permisos gubernamentales correspondientes, las partes suscribirían

---

[4] La aprobación de la segregación fue mediante resolución emitida por Administración de Reglamentos y Permisos (A.R.Pe.) el 22 de diciembre de 1994, en el caso 95-50-HPL-349.

un contrato de arrendamiento para establecer los negocios de comida rápida en dicho predio.[5]

Mientras tanto, de Choudens, Córdova y Passalacqua habían continuado sosteniendo conversaciones con Rivera Vázquez con el propósito de llegar a un acuerdo en sustitución del anterior. Luego de varias reuniones, las partes llegaron a un nuevo acuerdo.

Este nuevo acuerdo consistía en que de Choudens, Córdova y Passalacqua le entregarían a Rivera Vázquez los planos y las cartas compromisos de "Burger King" y "Church´s" que ya tenían para la construcción y operación de los establecimientos de comida rápida a cambio de la cantidad de cien mil dólares ($100,000). A tales fines, las partes suscribieron un segundo contrato el 5 de julio de 1995. La cantidad de $100,000 pactada incluía la devolución de los $40,000, pagados al señor Rivera Vázquez por concepto del contrato de opción anterior y el pago adicional, por Rivera Vázquez, de $60,000, correspondientes al precio fijado por el proyecto gestado por de Choudens, Córdova y Passalacqua.

Luego de firmado el referido contrato, Rivera Vázquez se dirigió a las oficinas del Arquitecto Augusto Gautier Mayoral para revisar los planos del proyecto. Gautier

---

[5] Las cartas compromisos contenían las cláusulas generales por las cuales "Burger King" y "Church´s" otorgarían el contrato de arrendamiento. Asimismo, éstos se comprometían a hacerse cargo de la construcción de los establecimientos de comida rápida.

Mayoral era el arquitecto de "Burger King" y de "Church´s". Éste le había preparado a de Choudens, Córdova y Passalacqua unos planos para la consulta de ubicación de 1994. En ese momento Rivera Vázquez se enteró que los planos existentes eran sólo unos esquemáticos y no unos finales de construcción. En vista de ello, el señor Rivera Vázquez contrató los servicios del Arquitecto Gautier Mayoral para que preparara los planos finales de construcción y gestionara los permisos gubernamentales correspondientes. Los honorarios acordados fueron $25,000.

Así las cosas, el 25 de agosto de 1995, de Choudens, Córdova y Passalacqua <u>lograron transferir las cartas compromiso de "Burger King" y "Church´s" a nombre de Rivera Vázquez</u>. En virtud de ello, el 25 de septiembre de 1996, Rivera Vázquez suscribió unas <u>escrituras públicas de contratos de arrendamiento</u> con Burger King y Church´s por un término de veinte años[6], con dos períodos de renovación de cinco años cada uno.[7] Rivera Vázquez se negó a pagarle a de Choudens, Córdova y Passalacqua la cantidad acordada en el contrato suscrito el 5 de julio de 1995, no obstante,

---

[6] Conforme a los términos del contrato el señor Rivera Vázquez devengaría por cada contrato de arrendamiento con Burger King y Church´s una renta de $36,000 anuales con una renta adicional equivalente al 4.5% en exceso de $800,000 de ventas anuales. <u>Estos términos eran los mismos que se habían acordado en las cartas compromisos que Choudens, Córdova y Passalacqua le habían entregado al señor Rivera Vázquez conforme al contrato suscrito el 5 de julio de 1995</u>.

[7] Burger King y Church´s comenzaron sus ventas en septiembre de 1997.

los requerimientos que estos últimos le hicieron a esos efectos.

Ante esta situación, José Álvarez de Choudens, Edwin Córdova Torres y Armando Passalacqua Alonso, presentaron ante el Tribunal de Primera Instancia, Sala Superior de Humacao, una demanda de cobro de dinero por incumplimiento de contrato contra Germán Rivera Vázquez, su esposa Ana Celia Rodríguez Meléndez y la Sociedad Legal de Gananciales compuesta por ambos. Los señores de Choudens, Córdova y Passalacqua, reclamaron al señor Rivera Vázquez el pago de la suma de $100,000 en cumplimiento de la carta-contrato suscrita entre ellos el 5 de julio de 1995.

Rivera Vázquez contestó la demanda y presentó una reconvención. Alegó, en síntesis, que el contrato del 5 de julio de 1995 no era válido, por razón de que hubo vicio en el consentimiento. Adujo que de Choudens, Córdova y Passalacqua lo engañaron ya que le habían hecho creer que los planos que tenían eran finales, cuando no lo eran. Solicitó al tribunal que declarara que el acuerdo suscrito el 5 de julio de 1995 no era legalmente exigible, y que ante el alegado incumplimiento de de Choudens, Córdova y Passalacqua con el contrato de opción suscrito el 6 de julio de 1993, declarase la resolución del mismo, así como la retención de los $40,000 recibidos, en virtud de éste. Solicitó, además, que se le indemnizara por los daños

causados por de Choudens, Córdova y Passalacqua por sus actos negligentes, falsos y engañosos.[8]

Luego de celebrado el juicio en su fondo, el tribunal de primera instancia emitió sentencia.[9] Mediante la misma, concluyó que, según la intención de las partes, el contrato suscrito el 5 de julio de 1995 <u>se refería a los planos pertinentes e indispensables y necesarios para el establecimientos de los restaurantes de comida rápida y no meramente a planos esquemáticos</u>. En consecuencia, declaró sin lugar la demanda presentada y con lugar la reconvención, imponiéndole a los demandantes recurridos el pago de veinticinco mil dólares ($25,000) en compensación por los gastos incurridos por Rivera Vázquez en la obtención de los planos requeridos para la construcción del proyecto. De igual manera, le impuso a los demandantes

---

[8] Luego de varios trámites procesales, el 2 de noviembre de 1999, Rivera Vázquez solicitó autorización al foro de instancia para radicar una "Segunda Reconvención Enmendada" en la cual solicitó del tribunal que declarara la novación extintiva del contrato de opción celebrado entre las partes el 6 de julio de 1993 en virtud del contrato suscrito el 5 de julio de 1995. Además, solicitó que declarara que de Choudens, Córdova y Passalacqua incumplieron el contrato suscrito el 5 de julio de 1995 al no entregar los planos finales de construcción, por lo que él no les adeudaba cantidad alguna de dinero. Asimismo, solicitó que condenara a de Choudens, Córdova y Passalacqua solidariamente al pago de $211,000 por las daños causados por el incumplimiento del contrato.

[9] En el juicio en su fondo declaró por la parte demandante-reconvenida el Sr. Edwin Córdova Torres y el Sr. Aniceto Solares Rivero, Vicepresidente Ejecutivo de Burger King. Por la parte demandada-reconveniente el Sr. Rivera Vázquez, el Sr. Reynaldo Rosario Agosto y el Arquitecto Augusto Gautier Mayoral.

el pago de diez mil dólares ($10,000) en concepto de honorarios de abogado por temeridad. No obstante, el foro de instancia se negó a concederle daños a Rivera Vázquez por el fundamento de que la prueba presentada a esos efectos era especulativa.

Inconformes con la referida sentencia, el 13 de agosto de 2001, de Choudens, Córdova y Passalacqua presentaron recurso de apelación ante el Tribunal de Apelaciones alegando, en síntesis, que erró el Tribunal de Primera Instancia al declarar sin lugar la demanda como consecuencia de haber errado al interpretar las cláusulas del contrato, a pesar que las mismas eran claras y no dejaban dudas sobre la intención de los contratantes. En específico, sostuvieron que, a lo sumo, lo que procedía era reducir la cantidad de $25,000 de la suma de dinero reclamada por ellos.

De Choudens, Córdova y Passalacqua presentaron ante el foro apelativo intermedio una moción sometiendo un proyecto de exposición narrativa para la consideración de dicho tribunal. Rivera Vázquez se opuso al mismo proponiendo uno propio. Ante el desacuerdo de las partes, el Tribunal de Apelaciones ordenó a de Choudens, Córdova y Passalacqua, para que procedieran a obtener una exposición narrativa aprobada por el Tribunal de Primera Instancia.

En fiel cumplimiento a la orden del Tribunal de Apelaciones, de Choudens, Córdova y Passalacqua sometieron una propuesta de exposición narrativa ante el Tribunal de

Instancia. Dicho foro, luego de recibir la correspondiente oposición de la parte contraria, acogió y autorizó como exposición narrativa el contenido de un escrito sometido por Rivera-Vázquez, titulado "Memorando sobre la prueba desfilada".[10]

El 22 de abril de 2002, no habiendo de Choudens, Córdova y Passalacqua presentado la exposición narrativa, el Tribunal de Apelaciones emitió una resolución, ordenándoles a éstos someter la exposición narrativa según intimado y advirtiéndoles que de no cumplir iban a proceder a resolver el recurso sin considerar los errores señalados que requerían la evaluación de prueba. El 29 de abril de 2002, Choudens, Córdova y Passalacqua presentaron un escrito al Tribunal de Apelaciones, acogiendo la exposición narrativa propuesta por Rivera Vázquez el 9 de octubre de 2001 ante el foro apelativo intermedio.

Finalmente, el 29 de mayo de 2001, mediante sentencia a esos efectos, el Tribunal de Apelaciones revocó el dictamen recurrido. En virtud de ello, el foro apelativo intermedio declaró con lugar la demanda y condenó a Rivera Vázquez a satisfacer la suma de $100,000 a Choudens, Córdova y Passalacqua. Redujo de dicha cantidad la suma de $25,000, como compensación por los gastos adicionales

---

[10] Este memorando sobre la prueba desfilada es igual al proyecto de exposición narrativa presentado anteriormente por el Rivera Vázquez. No obstante, del expediente en autos no surge las razones por las que esta exposición narrativa de la prueba no fue elevada al Tribunal de Apelaciones.

incurridos por Rivera Vázquez para la preparación de los planos finales de construcción. Fundamentó su determinación en que el contrato suscrito por las partes el 5 de julio de 1995 era válido y exigible toda vez que no hubo error en el consentimiento. Aun cuando reconoció que los demandantes incumplieron en cuanto a los planos finales de construcción, entendió que ese incumplimiento fue uno defectuoso por lo que procedía aplicar la doctrina de la *exceptio non rite adimpleti contractus*, reduciendo en la proporción correspondiente la reclamación contractual.

Rivera Vázquez presentó, oportunamente, una solicitud de reconsideración, alegando, en síntesis, que el Tribunal de Apelaciones había emitido su sentencia sin haber tenido ante sí la exposición narrativa de la prueba según aprobada por el Tribunal de Instancia. Alegó, además, que el incumplimiento de la entrega de los planos terminados de construcción no es una parte reducida de la prestación, sino que constituyó un incumplimiento total de su obligación contraída el 5 de julio de 1995, ya que las cartas compromisos de "Burger King" y "Church´s" no tenían ningún valor.

El 24 de junio de 2002, el Tribunal de Apelaciones declaró sin lugar la solicitud de reconsideración de Rivera Vázquez. Razonó que estaba facultado para considerar los señalamientos de error que envolvieran la apreciación de la prueba toda vez que la exposición

narrativa presentada por los apelados había sido acogida por la parte apelante. Asimismo, se fundamentó en que las cartas compromisos al igual que los planos eran parte integral del contrato por lo que entendían que hubo un incumplimiento parcial de las prestaciones pactadas.

Inconforme con la determinación, Rivera Vázquez recurrió ante este Tribunal --vía certiorari-- imputándole al foro apelativo intermedio, en síntesis y en lo pertinente, haber errado al considerar los méritos del recurso de apelación sin tener ante su consideración la versión oficial de la exposición narrativa de la prueba, en violación a lo dispuesto en la Regla 54 de las de Procedimiento Civil, 32 L.P.R.A. Ap. III, y de la Regla 20 del entonces vigente Reglamento del Tribunal de Circuito de Apelaciones de 1996. Alegó, además, que el foro apelativo intermedio erró al determinar que no hubo un incumplimiento total de las prestaciones por parte de los demandantes recurridos para con los demandados peticionarios, privándolos así de su facultad de dar por resuelto el vínculo contractual.

El 27 de septiembre de 2002 denegamos el recurso de certiorari. No obstante, luego de examinar una solicitud de reconsideración, presentada oportunamente por el peticionario, el 28 de febrero de 2003 expedimos el recurso.

Contando con la comparecencia de todas las partes, y estando en posición de resolver el recurso radicado, procedemos a así hacerlo.

I

Como es sabido, cuando en un recurso de apelación se ha señalado algún error relacionado con la suficiencia de la prueba testifical o con la apreciación de la prueba por parte del Tribunal de Primera Instancia, la parte apelante tiene que presentar una exposición narrativa de la prueba para que de esta manera el tribunal apelativo pueda cumplir cabalmente con su función revisora.[11] Regla 54.2 de Procedimiento Civil, 32 L.P.R.A. Ap. III, R. 54.2; Rivera Torres v. Pan Pepín, Inc., res. el 21 de abril de 2004, 2004 T.S.P.R. 59; Hernández v. San Lorenzo Const., res. el 20 de febrero de 2001, 2001 T.S.P.R. 18; Pueblo v. Calderón Hernández, 145 D.P.R. 603, 605 (1998).

En cuanto al uso de los mecanismos disponibles a las partes para presentar ante el foro apelativo intermedio la prueba testifical que tuvo ante si el Tribunal de Primera

---

[11] Esta norma se fundamenta en la doctrina claramente establecida por este Tribunal que un tribunal apelativo no intervendrá con las determinaciones de hechos ni con la adjudicación de credibilidad que hizo el juzgador de los hechos, salvo que haya mediado pasión, prejuicio, parcialidad o error manifiesto. Hernández v. San Lorenzo Const., res. el 20 de febrero de 2001, 2001 T.S.P.R. 18; Rolón v. Charlie Rental Car, Inc., 148 D.P.R. 420, 433 (1999); Huertas v. Cia. Fomento Recreativo, 147 D.P.R. 12, 31 (1998); López Vicil v. ITT Intermedia, Inc., 142 D.P.R. 857, 864 (1997).

Instancia, la Regla 54.2 de Procedimiento Civil, según enmendada, 32 L.P.R.A. Ap. III, R. 54.2, dispone de tres mecanismos para lograr el fin reseñado, a saber la exposición estipulada de la prueba, la exposición narrativa y la transcripción de evidencia.

De estos tres mecanismos, la referida disposición reglamentaria promueve principalmente el uso de la exposición estipulada de la prueba testifical. A esos efectos, se expresa en la misma que "la exposición narrativa procederá solamente en ausencia de una exposición estipulada y tras la autorización previa del Tribunal de Apelaciones." Regla 54.2, ante. De igual forma, se establece que "la transcripción procederá solamente cuando la parte que la interese demuestre al Tribunal de Apelaciones que no es posible preparar una exposición narrativa o estipulada, o que la exposición narrativa aprobada no expone adecuadamente la prueba oral, a pesar de las objeciones o enmiendas presentadas oportunamente ante el Tribunal de Instancia." *Ibíd*.

Para la consecución de una exposición estipulada de la prueba testifical, la Regla 54.2(c), dispone en lo pertinente que:

> ...(c) Dentro de los treinta (30) días siguientes a la presentación del escrito de apelación o de la solicitud de *certiorari*, la parte apelante o peticionaria preparara y someterá al Tribunal de Circuito de Apelaciones un proyecto de exposición narrativa de la prueba oral pertinente al recurso, con una moción en la que justificara la necesidad de que el tribunal considere la prueba oral para la adecuada disposición del recurso.

Notificara copia de la moción y del proyecto de exposición narrativa a la parte apelada o recurrida.

Durante los veinte (20) días siguientes, las partes harán esfuerzos, mediante comunicaciones y reuniones entre ellas, para lograr una exposición estipulada, tomando como base el proyecto de exposición narrativa de la parte apelante o peticionaria.

Si transcurridos dichos veinte (20) días no se produce una exposición estipulada, la parte apelada presentara dentro de los diez (10) días siguientes su oposición a la moción y al proyecto de estipulación de la parte apelante, en la cual señalará específicamente y en detalle, con referencia a la prueba presentada, sus objeciones al proyecto de la parte apelante y las razones que le impiden llegar a una exposición narrativa estipulada. <u>De lo contrario se podrá tomar el proyecto de la parte apelante como la exposición narrativa de la prueba oral</u>...

De la referida disposición reglamentaria surge que, en aquellos casos en que sea necesario presentar ante el foro apelativo intermedio un proyecto de exposición narrativa de la prueba oral desfilada ante el Tribunal de Primera Instancia, <u>el Tribunal de Apelaciones puede utilizar tal proyecto, aceptado por la parte apelada, como exposición estipulada de la prueba oral.</u>[12]

---

[12] En el nuevo Reglamento del Tribunal de Apelaciones de 2004, aprobado el 20 de julio de 2004, 2004 T.S.P.R. 121, se eliminó el orden de prelación en cuanto a los mecanismos para la reproducción de la prueba. No obstante en las reglas permanece el interés de que durante el proceso apelativo se utilice el mecanismo que demuestre mayor celeridad. Véase los Comentario de la Regla 76.1. del Reglamento del Tribunal de Apelaciones de 20 de julio de 2004, 2004 T.S.P.R. 121.

II

En el presente caso, el peticionario argumenta que el Tribunal de Apelaciones erró al considerar los méritos del recurso de apelación sin tener el beneficio de la exposición narrativa de la prueba aprobada por el Tribunal de Primera Instancia. No le asiste razón.

Luego de examinar el expediente del caso de autos, vemos que en un principio hubo unos desacuerdos y objeciones en cuanto a los proyectos de exposición narrativa de la prueba sometidos por las partes al Tribunal de Apelaciones. Dicha situación llevó al foro apelativo intermedio a ordenar a de Choudens, Córdova y Passalacqua a que sometieran una exposición narrativa de la prueba debidamente aprobada por el Tribunal de Primera Instancia conforme a la Regla 20 del entonces vigente Reglamento del Tribunal de Circuito de Apelaciones de 1996.

No habiendo de Choudens, Córdova y Passalacqua presentado la exposición narrativa según ordenado, el 22 de abril de 2002, el Tribunal de Apelaciones les ordenó que procedieran a someter en un término de siete (7) días la exposición narrativa  aprobada por el Tribunal de Primera Instancia, advirtiendo que de no cumplir, no iba a revisar los errores relacionados con la apreciación de la prueba. Los demandantes recurridos comparecieron ante el Tribunal de Apelaciones el 29 de abril de 2002, acogiendo la

exposición narrativa de la prueba presentada por el demandado apelante, el 9 de octubre de 2001.

La actuación de los demandantes recurridos, tuvo el efecto de lograr una estipulación en cuanto a la exposición de la prueba oral. Existiendo desde ese momento, pues, una exposición estipulada de la prueba, se tornó innecesario que el Tribunal de Apelaciones esperara que el Tribunal de Instancia elevara la exposición narrativa de la prueba aprobada. Realmente nos resulta difícil entender la posición asumida por el peticionario en este caso cuando la exposición narrativa de la prueba utilizada por el Tribunal de Apelaciones fue la que ellos mismos sometieron ante ese foro el 9 de octubre de 2001. [13]

Reconocemos que la responsabilidad de presentar la exposición narrativa de la prueba ante el Tribunal de Apelaciones recae, de manera principal, en la parte apelante. No obstante, no vemos razón por la cual el Tribunal de Apelaciones no pueda tomar como exposición estipulada un proyecto de exposición narrativa presentado por la parte apelada y luego acogida por la parte apelante. Sería absurdo exigirle en este caso al Tribunal de Apelaciones que tenga que esperar por la exposición narrativa aprobada por el foro de instancia, cuando las

---

[13] Más difícil se nos hace entender la posición del peticionario cuando el proyecto de exposición narrativa presentado el 9 de octubre de 2001 ante el Tribunal de Apelaciones es el mismo que fue aprobado por el Tribunal de Primera Instancia, el 25 de enero de 2002.

partes se han puesto de acuerdo en cuanto a la misma.[14] Ello, en atención a la preferencia que nuestro ordenamiento le otorga a la figura de la exposición estipulada frente a la de la exposición narrativa o, incluso, a la transcripción de la prueba.[15] Almodóvar Marchany v. Puig & Abraham, Inc., ante.

Concluimos pues, que actuó correctamente el Tribunal de Apelaciones al tomar el proyecto presentado por los demandados apelantes el 9 de octubre de 2001 y acogido posteriormente por la parte contraria, como la exposición estipulada de la prueba oral.

III

Hemos reiterado en numerosas ocasiones que en Puerto Rico rige el principio de la libertad de contratación, según el cual las partes contratantes pueden establecer los pactos, cláusulas y condiciones que tengan por conveniente, siempre que las mismas no sean contrarias a las leyes, a la moral ni al orden público. Art. 1207 del Código Civil de Puerto Rico, 31 L.P.R.A. sec. 3372. Irizarry López v. García Cámara, res. el 27 de noviembre

---

[14] Esta interpretación también es cónsona con el nuevo Reglamento del Tribunal de Apelaciones de 2004 que promueve el mecanismo que demuestre mayor celeridad en el proceso. Véase: Comentarios a la Regla 76.

[15] Recordemos que las reglas deben interpretarse de modo que garanticen una solución justa, rápida y económica de todo procedimiento. Regla 1 de las de Procedimiento Civil, 32 L.P.R.A. Ap.III R. 1.

de 2001, 2001 T.S.P.R. 161; <u>Trinidad</u> v. <u>Chade</u>, res. el 18 de enero de 2001, 2001 T.S.P.R. 007; <u>Arthur Young & Co.</u> v. <u>Vega III</u>, 136 D.P.R. 157 (1994); <u>Plaza del Rey, Inc.</u> v. <u>Registrador,</u> 133 D.P.R. 188 (1993); <u>Casiano, Jr.</u> v. <u>Borintex Mfg. Corp.,</u> 133 D.P.R. 127 (1993).

Sabido es que a partir del perfeccionamiento de un contrato, las partes quedan obligadas al cumplimiento de lo expresamente pactado y a las consecuencias que se deriven del mismo, ello conforme a la buena fe, al uso y a la ley.  Art. 1210 del Código Civil de P.R., 31 L.P.R.A. sec. 3375; <u>Trinidad</u> v. <u>Chade</u>, ante.

De esta manera, cuando un contrato es legal, válido y carente de vicios del consentimiento, el mismo constituye la ley entre las partes y debe cumplirse a tenor del mismo. Artículo 1044 del Código Civil, 31 L.P.R.A. sec. 2994; <u>Constructora Bauzá, Inc.</u> v. <u>García López</u>; 129 D.P.R. 579, 593 (1991); <u>Cervecería Corona v. Commonwealth Ins. Co.,</u> 115 D.P.R. 345 (1984). Es por ello, que el Artículo 1054 del Código Civil, 31 L.P.R.A. sec. 3018, sujeta a aquellos que de alguna manera contravengan sus obligaciones a la indemnización de los daños y perjuicios causados. Bajo dicho supuesto, todo incumplimiento contractual dará lugar a un resarcimiento.

Las acciones *ex contractu* se basan en el quebrantamiento de un deber que surge de un contrato expreso o implícito, y tienen por objeto que se cumplan las promesas sobre las cuales las partes otorgaron su

consentimiento. Ramos v. Orientalist Rattan Furnt., Inc., 130 D.P.R. 712 (1992); Ocasio Juarbe v. Eastern Airlines, Inc., 125 D.P.R. 410, (1990); Santiago Nieves v. A.C.A.A., 119 D.P.R. 711, (1987); Mejías v. López, 51 D.P.R. 21, 26 (1937). Por ende, para que proceda esta acción tiene que haber habido un acuerdo de voluntades que genere una obligación, situación o estado de derecho resultante de un convenio y que haya creado unas expectativas a base de las cuales actuaron las partes. Trinidad v. Chade, ante.

En el caso de las obligaciones recíprocas, como es el contrato aquí en controversia, el Artículo 1077 del Código Civil, 31 L.P.R.A. sec. 3052, provee:

> Sec. 3052. Derecho de resolver obligaciones recíprocas
>
> La facultad de resolver las obligaciones se entiende implícita en las recíprocas, para el caso de que uno de los obligados no cumpliere con lo que le incumbe.
>
> El perjudicado podrá escoger entre exigir el cumplimiento o la resolución de la obligación, con el resarcimiento de daños y abono de intereses en ambos casos. También podrá pedir la resolución, aun después de haber optado por el cumplimiento, cuando éste resultare imposible.

De la referida disposición estatutaria surge que ante un incumplimiento de una obligación bilateral, el perjudicado puede optar entre exigir el cumplimiento de la obligación o su resolución, y en ambos casos, si tal incumplimiento ha tenido repercusiones en su patrimonio de

forma desfavorable, puede reclamar el resarcimiento por los daños ocasionados.

En cuanto a la resolución del contrato, hemos indicado que la referida disposición estatutaria establece una condición resolutoria tácita en todo contrato bilateral que opera "ex propio vigore". Constructora Bauzá, Inc. v. García López, ante. En consecuencia, si uno de los contratantes incumple el otro puede darlo por resuelto sin necesidad de que un tribunal así lo declare. Flores v. Municipio de Caguas, 114 D.P.R. 521 (1983); Sucn. Escalera v. Barreto, 81 D.P.R. 596 (1935).

Cuando nos enfrentamos a un cumplimiento parcial o defectuoso, en principio, se justifica el ejercicio de la acción de resolución. No obstante, en la doctrina civilista se entiende que el ejercicio del derecho de resolución no debe ser utilizado en todas las situaciones ya que la buena fe en la contratación puede imponer alguna moderación a este resultado. L. Díez-Picazo y A. Gullón, Sistema de Derecho Civil, 4ta ed. rev., Madrid, Ed. Tecnos, 1983, Vol. II, págs. 226-227; José Puig Brutau, en Fundamentos de Derecho Civil, 2da ed. rev., Barcelona, Ed. Bosch, Tomo I, Vol. 2, 1985, págs. 126-127.

Dicho de otra manera, únicamente si el cumplimiento parcial o defectuoso implica la frustración de la finalidad contractual para la parte perjudicada, procederá entonces, la resolución del contrato. Díez-Picazo y Gullón, op. cit., pág. 227; Puig Brutau, op. cit., pág.

127. En los <u>demás casos</u>, en que la prestación se ha efectuado parcialmente o resulta defectuosa, será procedente exigir el cumplimiento total o libre de defectos y, en los casos en que proceda, una reducción proporcional del precio.[16] *Ibíd*.

Por otro lado, y como señaláramos anteriormente, el Artículo 1077, ante, de igual forma, reconoce que ante el incumplimiento de una obligación recíproca, la parte perjudicada puede exigir su cumplimiento. De este manera, el Código Civil consagra el principio general que postula que en las obligaciones bilaterales ninguna de las partes puede demandar el cumplimiento de la obligación contraria sin cumplir u ofrecer el cumplimiento de la obligación propia. En otras palabras, si el que incurre en incumplimiento exige la satisfacción de la prestación debida, la otra parte puede oponer la defensa del contrato

---

[16] El profesor José Ramón Vélez Torres nos señala al respecto:

> . . . <u>Igualmente, cuando el cumplimiento parcial</u> <u>no supone incumplimiento absoluto, debe moderarse</u> <u>el impulso a la hacia la resolución, pues podría</u> <u>ocurrir una injusticia cuando se opte por la</u> <u>resolución</u>. Quizás, en estos casos sirva mejor un remedio que logre el balance contractual sin llegar al extremo. <u>En cada caso debe siempre</u> <u>atenderse a si la prestación parcial o</u> <u>defectuosa, y aún la hecha con retraso, implican</u> <u>la frustración de la finalidad contractual de la</u> <u>parte perjudicada</u>. José Ramón Vélez Torres, <u>Curso</u> <u>de Derecho Civil</u>, <u>Derecho de Obligaciones</u>, Univ. Interamericana de Puerto Rico, Segunda Edición, 1997, págs. 76-77.(Citas omitidas).

incumplido. <u>Mora Dev. Corp.</u> v. <u>Sandín</u>, 118 D.P.R. 733, 742 (1987).

Este principio general en materia de contratos recíprocos, es conocido en la doctrina civilista <u>como la excepción de contrato no cumplido</u> (*exceptio non adimpleti contractus*) <u>Constructora Bauzá, Inc.</u> v. <u>García López</u>, ante. Esta excepción de contrato no cumplido se fundamenta en la regla de la ejecución simultánea de las obligaciones recíprocas. Artículo 1053 del Código Civil, 31 L.P.R.A. sec. 3017; Puig Brutau, *op*. *cit*., pág. 115.

Existe una modalidad de la excepción de contrato no cumplido, que la jurisprudencia y la doctrina civilista ha reconocido como la "excepción de contrato no cumplido adecuadamente" o "excepción de falta de cumplimiento regular", denominada en latín como la *exceptio non rite adimpleti contractus*.[17] Sentencia del Tribunal Supremo Español de 3 de marzo de 1991 (Repertorio Aranzadi, núm. 3304); Sentencia del Tribunal Supremo Español de 17 de abril de 1976 (Repertorio Aranzadi, núm. 1811); Díez-Picazo y Gullón, *op*. *cit*., pág. 227; Puig Brutau, *op*. *cit*., pág. 116. Esta excepción aplica en el caso que una de las partes haya cumplido la prestación parcial o defectuosamente sin ajustarse debidamente a lo que exige el vínculo obligatorio.

---

[17] También se le conoce como la "doctrina del cumplimiento parcial o defectuoso." D. Espín Canovas, <u>La excepción de incumplimiento contractual</u>, 17 An. Der. Civ. 543, 568 (1964).

En Martínez v. Colón Franco, Concepción, 125 D.P.R. 15, 32-33 (1989), y Master Concrete Corp. v. Fraya, S.E., 152 D.P.R.616, 630-631 (2000), este Tribunal tuvo la ocasión de expresarse en torno a esta figura jurídica. En los referidos casos, expresamos que la modalidad de *exceptio non rite adimpleti contractus* era una defensa oponible a un demandante que ejecuta su prestación de forma parcial o defectuosa y que le permite al demandado reducir el importe de lo no realizado o en atención a lo llevado a cabo defectuosamente. Las antes reseñadas expresiones no son enteramente correctas.[18] Reexaminamos, en consecuencia, el trasfondo doctrinal de esta figura jurídica.

La *exceptio non rite adimpleti contractus* es una defensa disponible al demandado, la cual, es oponible al demandante que pretende exigir el cumplimiento de una obligación a pesar de que él ha cumplido parcial o defectuosamente con su prestación. El efecto o consecuencia primordial de la aplicación de la excepción es que el demandado no vendrá obligado a cumplir con su parte hasta tanto el demandante cumpla con su prestación totalmente o libre de defectos. Véase: Díez-Picazo y

_____

[18] Véase, a esos efectos, la Opinión Concurrente emitida por el entonces Juez Asociado Federico Hernández Denton en el caso de Master Concrete Corp. v. Fraya, S.E., ante. Véase también: Michel J. Godreau Robles, Análisis del Término 2000-01 del Tribunal Supremo de Puerto Rico: Derecho de Obligaciones y Contratos, 71 Rev. Jur. U.P.R. 383, 387 (2002).

Gullón, *op. cit.*, págs. 227-228; Puig Brutau, *op. cit.*, pág. 116; Espín Canovas, *ante*.

Ahora bien, no todo supuesto de cumplimiento parcial o defectuoso puede tener el efecto de liberar al demandado de cumplir con su prestación. El demandado no podrá invocar con éxito la doctrina en los casos en que la aplicación de la *exceptio non rite adimpleti contractus* puede resultar contraria al principio de buena fe en la contratación. D. Espín Canovas, La excepción de incumplimiento contractual, 17 An. Der. Civ. 543, 568 (1964).

Así, por ejemplo, si la causa del incumplimiento parcial o defectuoso se debe a la conducta del demandado, resulta obvio que no se puede invocar la excepción. Tampoco se podrá invocar, con éxito, la excepción si el demandado admitió la contraprestación sin reserva ni protesta alguna cuando pudo comprobar los defectos ya que iría contra sus propios actos. Díez-Picazo y Gullón, *op. cit.*, pág. 227; Puig Brutau, *op. cit.*, pág. 116. En estos casos es que el tribunal deberá reconocer una disminución proporcional del precio, en razón de lo no cumplido o de los defectos en la prestación. *Ibíd*.

En virtud de lo antes expuesto, aclaramos y resolvemos que la defensa de *exceptio non rite adimpleti contractus* puede ser invocada por el demandado en los casos en que el demandante pretende exigir el cumplimiento de una obligación a pesar de que él ha cumplido parcial o

defectuosamente con su prestación y su efecto será, que el demandado no vendrá obligado a cumplir con su parte hasta tanto el demandante cumpla con la suya. No obstante, en los casos en que la aplicación de la *exceptio non rite adimpleti contractus* puede resultar contraria al principio de la buena fe contractual, el demandado no podrá invocar la excepción exitosamente. En esos casos procede reducir el importe de lo no realizado o en atención a lo llevado a cabo defectuosamente.

## IV

En la controversia hoy ante nuestra consideración, debemos determinar, en primer lugar, si los señores de Choudens, Córdova y Passalacqua incurrieron en un incumplimiento total con relación al contrato suscrito con el señor Rivera Vázquez el 5 de julio de 1995, y, en segundo término, el efecto de dicho incumplimiento sobre el vínculo contractual. Veamos.

De entrada señalamos que constituye jurisprudencia reiterada que, en lo que respecta a la evaluación de prueba documental, este Tribunal está en idéntica situación que los tribunales de instancia, Trinidad v. Chade, ante; Ramírez, Segal & Latimer v. Rojo Rigual, 123 D.P.R. 161 (1989); Díaz García v. Aponte Aponte, 125 D.P.R. 1 (1989); razón por la cual en el presente caso estamos en la misma posición que el foro de instancia para

evaluar la "carta-contrato" de fecha 5 de julio de 1995. Veamos.

El contrato suscrito por las partes en este caso expresa lo siguiente:

5 de julio de 1995

Sr. Germán Rivera
Las Piedras, Puerto Rico

Estimado señor Rivera:

Sirve la presente para notificarle que aceptamos su oferta de compra del proyecto Fast Food aprobado en la consulta de ubicación 94-50-0124-JUP.

La misma consiste de devolver los $40,000 de la opción de compra y $60,000.00 por el proyecto. Nosotros le daremos los planos que tenemos y compromisos con Caribbean Restaurant, Inc. (Burger King) y Southamerican Restaurant Corporation (church).

Para beneficio de todos es necesario acelerar la transacción ya que Burger King y Church quieren construir este año.

Esta negociación fue discutida a través de Córdova con Usted.

Un examen de dicha carta-contrato nos convence que estamos ante un contrato bilateral en donde los señores de Choudens, Córdova y Passalacqua se comprometieron a cumplir con dos cosas: a entregar las cartas compromisos de "Burger King" y de "Church's" y a entregarles los planos del proyecto para que Rivera Vázquez pudiera establecer los negocios de comida rápida en su terreno. Por su parte, Rivera Vázquez se comprometió a devolver los $40,000 que los señores de Choudens, Córdova y Passalacqua

le habían entregado en virtud del contrato de opción del 6 de julio de 1993 y pagar $60,000 por el proyecto, para un total de $100,000.

En el caso de autos, los señores de Choudens, Córdova y Passalacqua le entregaron a Rivera Vázquez las cartas compromisos y unos planos que les había preparado el Arquitecto Augusto Gautier Mayoral. Estos planos no eran planos finales de construcción, aprobados por las agencias gubernamentales correspondientes, que le permitiera a Rivera Vázquez comenzar con la construcción del proyecto inmediatamente. Esta es la razón por la que Rivera Vázquez se niega a pagar el dinero ya que él entiende que los señores de Choudens, Córdova y Passalacqua incumplieron el contrato, ya que al indicarle que le iban a entregar "los planos que tenemos" necesariamente se referían a los planos finales de construcción. Por su parte, los señores de Choudens, Córdova y Passalacqua argumentan que la frase "los planos que tenemos" se refería a los planos esquemáticos que ellos tenían en su poder.

El Tribunal de Primera Instancia, luego de celebrar el juicio en su fondo y de escuchar los testigos de ambas partes, concluyó que Rivera Vázquez contrató con el entendimiento implícito que los planos que se le ofrecían en dicho contrato eran planos de construcción finales y no meros planos esquemáticos; ello en vista de que se requería la construcción inmediata de los locales en controversia.

Sabido es que un tribunal apelativo no deberá, de ordinario, intervenir con las determinaciones de hechos ni con la adjudicación de credibilidad que ha realizado el juzgador de los hechos, salvo que haya mediado pasión, prejuicio, parcialidad o error manifiesto, Hernández v. San Lorenzo Const., ante; Rolón v. Charlie Rental Car, Inc., 148 D.P.R. 420, 433 (1999); Huertas v. Cia. Fomento Recreativo, 147 D.P.R. 12, 31 (1998); López Vicil v. ITT Intermedia, Inc., 142 D.P.R. 857, 864 (1997). En el presente caso no existe ninguna de estas situaciones, por lo que no hay razón alguna para intervenir con la apreciación de la prueba oral que hiciera el foro de instancia.

El peticionario Rivera Vázquez argumenta que el Tribunal de Apelaciones erró al determinar que los señores de Choudens, Córdova y Passalacqua cumplieron parcialmente con sus obligaciones contractuales ya que, aunque no entregaron los planos finales de construcción, transmitieron a Rivera Vázquez los compromisos que ya habían obtenido de Burger King y Church´s. De igual manera, argumenta que el foro apelativo intermedio erró al aplicar la doctrina de *exceptio non rite adimpleti contractus* y proceder a reducir el importe de lo pactado en $25,000 por el costo de preparación de los planos finales.

Rivera Vázquez entiende que el incumplimiento de los recurridos fue total toda vez que la finalidad del

contrato era la entrega de los planos finales de construcción del proyecto ya que las cartas compromisos de "Burger King" y "Church´s" no tenían valor alguno, por lo que estaba facultado a no cumplir con su prestación y dar por resuelto el vínculo contractual. En la alternativa en que se determine que hubo incumplimiento parcial, el peticionario entiende que la excepción de cumplimiento parcial o defectuoso (*exceptio non rite adimpletis contractus*) sólo aplica cuando la parte incumplida es de poca importancia en comparación con la prestación principal. Conforme a ello, argumenta que el incumplimiento de la entrega de los planos finales de construcción es la parte esencial y que la transferencia de las cartas contratos no tenían valor alguno.

En lo que respecta a su alegación de incumplimiento total del contrato, no podemos suscribir la posición del peticionario. Las cartas contratos, al igual que los planos de construcción, eran parte integral del contrato. Decir que las cartas contratos carecían de valor es negar el hecho que al día de hoy Rivera Vázquez está generando cuantiosos ingresos en virtud del contrato de arrendamiento-producto de dichas cartas compromisos que lograron los recurridos con "Burger King" y "Church´s" [19];

---

[19] El Sr. Aniceto Solares, Vice-Presidente de Burger King, declaró que los ingresos totales de Rivera Vázquez por concepto de renta sobre el predio donde se construyó finalmente el negocio de comida rápida, para los primeros dos años totalizaron $160,269.48 y que se proyectaba un **(Continúa . . .)**

compromiso que ellos lograron, además, se le transfiriera a Rivera Vázquez. En vista de ello, forzoso es concluir que los señores de Choudens, Córdova y Passalacqua cumplieron parcialmente con el contrato al entregar a Rivera Vázquez los compromisos con "Burger King" y "Church´s".

Ahora bien, ¿qué efecto tuvo ese incumplimiento parcial de los recurridos sobre el vínculo contractual? En primer lugar, como indicáramos anteriormente, cuando estamos ante un incumplimiento parcial o defectuoso, la resolución del vínculo contractual sólo procederá cuando se haya frustrado la finalidad contractual para la parte perjudicada. Díez-Picazo y Gullón, *op. cit.*, pág. 227; Puig Brutau, *op. cit.*, pág. 127.

El peticionario Rivera Vázquez argumenta, repetimos, que la finalidad del contrato era la adquisición de los planos de construcción finales. No estamos de acuerdo. La finalidad del contrato era cederle a Rivera Vázquez todo lo necesario para establecer los negocios de comida rápida en su terreno. Conforme a ello, los señores de Choudens, Córdova y Passalacqua le vendieron a Rivera Vázquez los compromisos con Burger King y Church´s y los planos del proyecto. Ambas cosas, los compromisos y los planos, eran esenciales para el establecimiento del proyecto.

---

aumento en los ingresos para los años futuros. Cabe señalar que eso no incluye los ingresos generados por el contrato con Church´s.

En virtud de lo antes expuesto, concluimos que en este caso no procede declarar la resolución del contrato suscrito por las partes el 5 de julio de 1995. La finalidad contractual no fue frustrada toda vez que, no obstante el incumplimiento parcial en que incurrieron de Choudens, Córdova y Passalacqua, Rivera Vázquez pudo lograr su propósito de establecer los negocios de comida rápida en su terreno.

De igual forma, Rivera Vázquez no podía invocar, con éxito, la defensa de la *exceptio non rite adimpleti contractus* ya que éste admitió la prestación ejecutada parcialmente, al aceptar las cartas contratos de "Burger King" y "Church's". Una persona no puede aceptar lo que le conviene, lucrarse con ello, y descartar lo que no le gusta. Rivera Vázquez no cumple con el requisito de buena fe para poder invocar exitosamente la excepción.

Permitirle a Rivera Vázquez invocar la defensa de *exceptio non rite adimpleti contractus* sería ir contra el principio de buena fue que se aplica a toda contratación. La buena fe, como sabemos, es un principio general del derecho que permea todo nuestro ordenamiento jurídico y que goza de firme arraigo.[20] Conforme a ello, procede que se reduzca el importe de lo pactado a $75,000, ello en

---

[20] Marcial v. Tomé, 144 D.P.R. 522 (1997); Ramírez v. Club Cala de Palmas, 123 D.P.R. 339 (1989); Catalytic Ind. Maint. Co. v. F.S.E., 121 D.P.R. 98 (1988); H.U.C.E. de Ame. v. V & E Eng. Const., 115 D.P.R. 711 (1984); Velilla v. Pueblo Supermarkets, Inc., 111 D.P.R. 585 (1981).

virtud, de los $25,000 que tuvo que pagar Rivera Vázquez por los planos finales de construcción.

V

En virtud de lo antes expuesto, procede confirmar la sentencia emitida por el Tribunal de Apelaciones.

Se dictará Sentencia de conformidad.


FRANCISCO REBOLLO LÓPEZ
Juez Asociado

EN EL TRIBUNAL SUPREMO DE PUERTO RICO


José M. Álvarez de Choudens
y otros

    Demandantes-recurridos

       vs.                   CC-2002-571     CERTIORARI

Germán Rivera Vázquez
y otros

    Demandados-peticionarios


SENTENCIA

San Juan, Puerto Rico, a 17 de junio de 2005


      Por los fundamentos expuestos en la Opinión que antecede, la cual se hace formar parte íntegra de la presente, se dicta Sentencia confirmatoria de la emitida en el presente caso por el Tribunal de Apelaciones.

      Lo acordó el Tribunal y certifica la Secretaria del Tribunal Supremo. El Juez Asociado señor Fuster Berlingeri concurre en el resultado sin opinión escrita.


                  Aida Ileana Oquendo Graulau
               Secretaria del Tribunal Supremo