Estado Libre Asociado de Puerto Rico
TRIBUNAL DE APELACIONES
PANEL VIII

| | | |
|---|---|---|
| ECO SPECTRUM TECHNOLOGIES CORP.<br><br>Demandante-Apelante<br><br>Vs.<br><br>CENTURY FROZEN FOODS, MARIO CHALAS, FULANA DE TAL Y LA SOCIEDAD DE BIENES GANANCIALES COMPUESTA POR AMBOS<br>Demandados-Apelados | KLAN202300667 | *APELACIÓN* procedente del Tribunal de Primera Instancia, Sala Superior de Carolina<br><br>Civil Núm.<br><br>SJ2019CV02313<br><br>Sobre:<br><br>Cobro de Dinero |

Panel integrado por su presidente, el Juez Rivera Colón, el Juez Monge Gómez y el Juez Cruz Hiraldo.

Cruz Hiraldo, Juez Ponente

**SENTENCIA**

En San Juan, Puerto Rico, a 29 de septiembre de 2023.

Comparece ante nos, ECO Spectrum Technologies COPR (en adelante, "Eco Spectrum" o "Parte Apelante"), quien presenta recurso de "Apelación Civil" en el que solicita la revocación de la *Sentencia Sumaria* emitida, el 24 de mayo de 2023, notificada y archivada el 25 de mayo de 2023, por el Tribunal de Primera Instancia, Sala Superior de Carolina. Mediante dicho dictamen, el foro primario declaró "Ha Lugar" la Solicitud de Sentencia Sumaria presentada por la parte apelada.

Examinada la solicitud de autos, la totalidad del expediente y el estado de derecho aplicable ante nuestra consideración, procederemos a resolver por los fundamentos que expondremos a continuación.

I

En el caso ante nos, la Parte Apelante radicó *Demanda* el 7 de marzo de 2019, enmendándola el 11 de junio de 2019, luego de que

Century Frozen Foods (en adelante, Century Frozen o Parte Apelada) solicitara una exposición más definida de las alegaciones. Dicha Demanda se presentó en contra de Century Frozen, Mario Chalas, Fulana de Tal y la Sociedad Legal de Gananciales compuesta por ambos. Eco Spectrum alegó que, Century Frozen le adeudaba la cantidad de $33,798.08 por una orden de hojas plásticas, realizada el 1 de junio de 2017. La Parte Apelante sostuvo que Century Frozen se negó a pagar por un aparente cambio en el precio inicialmente pactado. Arguyó que el cambio se debió a una imposición de un arbitrio de nueva creación a las importaciones de la República de China, el cual no existía al momento del acuerdo. Siendo así, Eco Spectrum sostiene que le corresponde a Century Frozen el pago por el impuesto y, además, comprar la totalidad de la mercancía ordenada a un precio distinto al originalmente acordado.

El 7 de julio de 2019, Century Frozen presentó *Moción de Sentencia Sumaria en Solicitud de Desestimación*. Arguyó que Eco Spectrum no tenía derecho a la concesión de remedio alguno y que no había controversia de hechos medulares que impidieran la disposición sumaria del caso. Alegó que hubo un aumento del 25% en los arbitrios por las importaciones de China y que el mismo es responsabilidad de Eco Spectrum. Esto debido a que el impuesto no existía al momento de realizar la orden. Según se desprende del expediente, las partes pactaron la venta por un precio fijo, en el cual no se incluyó que pudiera variar como consecuencia del aumento en los arbitrios. Además, señaló como frívola la pretensión de incluir al Sr. Chalas y la Sra. Pérez como codemandados porque el primero actuó en todo momento como gerente general de Century Frozen y no en su carácter personal. La Parte Apelada adjuntó evidencia junto a su solicitud de Sentencia Sumaria para sostener los hechos que planteó como incontrovertidos, entre los cuales estaba la orden de compra, correos electrónicos sobre el retraso de la llegada de los

productos y una declaración jurada. El 26 de julio de 2019, la Parte Apelante solicitó prórroga de 20 días para oponerse a la Sentencia Sumaria, pero no consta en el récord que hubiera presentado su oposición dentro del término solicitado.

El 22 de agosto de 2019, notificada el 26 de agosto de 2019, el Tribunal de Primera Instancia emitió *Resolución* en la cual declaró no ha lugar la *Moción de Sentencia Sumaria*, por el momento, y se le ordenó a Century Frozen contestar la *Demanda Enmendada* en un término de 20 días.

Por su parte, el 15 de agosto de 2019, Eco Spectrum presentó *Moción en Solicitud de Sentencia Sumaria*, en la cual reiteró las alegaciones de la *Demanda Enmendada* e incluyó una enumeración de hechos incontrovertidos. Sin embargo, no sometió evidencia admisible que sostuviera sus alegaciones, según requiere la Regla 36.3 de Procedimiento Civil.[1] En la *Resolución* del 26 de agosto de 2019, notificada en la misma fecha, el Foro Primario declaró no ha lugar a la *Moción de Sentencia Sumaria*, por incumplir con la Regla 36.3 de Procedimiento Civil[2]. La Parte Apelante no presentó reconsideración de dicha determinación.

El 23 de septiembre de 2019, Century Frozen contestó la *Demanda Enmendada* y reconvino en contra de la Parte Apelante. En esta, señaló que Eco Spectrum dilató injustificadamente por más de un año la entrega de la mercancía ordenada y que, además, aumentó el precio de manera unilateral por la imposición de impuestos que no se habían acordado. Por otra parte, Century Frozen alegó en la *Reconvención* mala fe contractual, dolo y temeridad, por lo que reclamó el pago de no menos de $87,500 a raíz de los daños ocasionados.

---

[1] 32 LPRA Ap. V. R. 36.3.
[2] *Id.*

Luego de varios trámites procesales y de finalizado el descubrimiento de prueba, el 4 de agosto de 2022, Century Frozen presentó *Segunda Moción de Sentencia Sumaria,* no obstante, el *Informe de Conferencia con Antelación a Juicio* estaba calendarizado para el 9 de agosto de 2022, por lo que el Tribunal de Primera Instancia exhortó a las partes a presentar las mociones dispositivas una vez el *Informe de Conferencia con Antelación a Juicio* fuera aceptado por el Tribunal.

El 8 de marzo de 2023, el Foro Primario aceptó el *Informe de Conferencia con Antelación a Juicio* junto con la evidencia presentada por las partes. Además, reiteró que presentaran sus mociones dispositivas tomando en consideración las estipulaciones de hechos y los documentos sometidos en este.

A tenor con lo anterior, el 27 de marzo de 2023, Century Frozen presentó *Tercera Moción de Sentencia Sumaria.* En ésta planteó que la controversia del caso era una de estricto derecho, la cual se limitaba a determinar a cuál de las partes le corresponde el pago de los árbitros de importación de la mercancía, los cuales eran inexistentes al momento de realizar la orden y de los cuales no se realizó ningún acuerdo. Por su parte, alegó que al no haberse considerado como parte del acuerdo las fluctuaciones en el precio por concepto de arbitrios, estos le corresponden asumirlos al importador y no al comprador que pagó por la mercancía al precio fijo pactado.

En desacuerdo, el 5 de mayo de 2023, la parte apelante presentó *Oposición a Tercera Moción de Sentencia Sumaria.* En síntesis, alegó que Century Frozen aceptó haber hecho pagos parciales y no haber recibido el restante de la mercancía, a razón de la imposición de arbitrios adicionales.

Luego de presentadas las posturas de ambas partes y examinada la evidencia presentada, el Tribunal de Primera Instancia

determinó que no existen controversias de hechos medulares, sino de derecho. Por lo que, procedió a resolver conforme lo establece la Regla 36 de Procedimiento Civil.[3] Siendo así, el 24 de mayo de 2023, notificada el 25 de mayo de 2023, el Foro de Instancia emitió *Sentencia Sumaria* en la cual realizó las siguientes determinaciones de hechos:

1. Mediante la Orden 27328, de 16 de mayo de 2017, Century Frozen ordenó a Eco Spectrum hojas plásticas para la envoltura de sus productos, específicamente 200 unidades de hojas plásticas tamaño 8 X 9 a un precio por unidad de $69.92, y 200 unidades de hojas plásticas tamaño 7.5 X 7.5 a un precio por unidad de $49.97.

2. Ese mismo día, el 16 de mayo de 2017, Century Frozen, a través de su gerente general, Mario Chalas, firmó una Solicitud de Crédito que, en su segunda página incluye una parte titulada "Garantía Personal Limitada".

3. El 20 de julio de 2017, la supervisora de Compras y Cuentas a Pagar de Century Frozen, Omayra Carrasquillo, envió un correo electrónico a Eco Spectrum para indagar cuándo llegaría la mercancía, a lo que Eco Spectrum respondió que el embarque ya estaba terminado y debía llegar en unas cuatro semanas.

4. Tres meses después, el 11 de octubre de 2017, Eco Spectrum hizo las entregas correspondientes a la Orden 27328, según consta en la Factura 3126.

5. Century Frozen pagó la totalidad de la Orden 27328 el 1 de diciembre de 2017 mediante el cheque 45095.

6. El 17 de mayo de 2017, un día después de que Century Frozen hiciera la primera orden de compra, Eco Spectrum entregó a Century Frozen una cotización para 500 unidades adicionales de hojas plásticas tamaño 7.5 X 7.5 por el precio de $55.62 por unidad, que totalizaban $27,810, y 500 unidades de hojas plásticas tamaño 8 X 9 por el precio de $75.82, que totalizaban $37,910.

7. El 1 de junio de 2017, Century Frozen hizo a Eco Spectrum la Orden 27438 para comprar 500 unidades de hojas plásticas tamaño 7.5 X 7.5 por el precio de $55.62 por unidad, que totalizaban

---

[3] 32 LPRA Ap. V, R. 36

$27,810; y 500 unidades de hojas plásticas tamaño 8 X 9 por el precio de $75.82, que totalizaban $37,910.

8. El 1 de marzo de 2018, la Sra. Carrasquillo envió un correo electrónico a Eco Spectrum indagando sobre el status de la orden que había hecho nueve meses antes, la Orden 27438 de 1 de junio de 2017, pues según hizo constar, había dado seguimiento en varias ocasiones, pero no había logrado respuesta.

9. El 26 de abril de 2018, la Sra. Carrasquillo envió un nuevo correo electrónico a Eco Spectrum cuestionando si la Orden 27438 de Century Frozen se había cancelado, pues se había hecho nueve meses antes, y aún no se había entregado. Incluso, hizo constar que si la misma no había llegado, interesaban cancelarla.

10. El 27 de abril de 2018, la Sra. Jeannie Calero, de Eco Spectrum, respondió al correo electrónico de la Sra. Carrasquillo con un correo electrónico en que expresó que "[l]a primera parte de la orden se le entregó en octubre. Luego de esto usted[es] nos indicaron que detuviéramos la producción en lo que arreglaban sus facilidades de la empresa que representa".

11. En ese mismo correo electrónico la Sra. Calero admitió que posteriormente Century Frozen "le informó a la ex empleada Jomaris Cruz [de Eco Spectrum] que podíamos continuar con la producción. Su orden está en tránsito y esperamos recibirla en tres semanas. Como es de su conocimiento el acarreo de EEUU a PR ha tenido problemas y esto ha demorado la entrega del contenedor a las facilidades".

12. La Sra. Carrasquillo respondió al mensaje de la Sra. Calero el 30 de abril de 2018, indicándole que desde el mes de diciembre habían solicitado que se continuara con la producción, y que le había dado seguimiento en enero y febrero de 2018, y la respuesta siempre era que la mercancía estaba en tránsito. Como ya habían transcurrido cuatro meses desde el ´release´ a la Orden, la Sra. Carrasquillo solicitó que se le diera una fecha específica de entrega.

13. El Sr. Alejndro [sic] Cofresí, Presidente de la demandante, reconoció que el proceso de producción de un producto como el que ordenó Century Frozen demora, aproximadamente, dos a tres meses desde su etapa de "set up" hasta la entrega.

14. Más de un año después de que Century Frozen hiciera la Orden 27438, y a pesar de que desde el 27 de abril de 2018 se le aseguró que la mercancía ya estaba en tránsito y demoraría tres semanas, Eco Spectrum no comenzó las gestiones para el despacho de la mercancía relacionada a ésta hasta el 17 de julio de 2018.

15. El Sr. Cofresí no pudo explicar por qué la mercancía demoró más de cuatro meses desde que se solicitó que se retomara la producción de la orden en diciembre de 2017, hasta que comenzaron los despachos en julio de 2018.

16. El 21 de agosto de 2018, la Sra. Carrasquillo envió un nuevo correo electrónico a Eco Spectrum reiterando que la Orden 27438 se había hecho el 1 de junio de 2017, y que necesitaba información de cuándo recibirían el resto de la orden. Además, recalcó que el compromiso de Eco Spectrum había sido que siempre tendrían disponible inventario para cuando se le necesitara y, a pesar de los meses transcurridos, eso no se cumplió.

17. El 10 de octubre de 2018, Eco Spectrum finalmente entregó a la planta de Century Frozen en Carolina 56 cajas de hojas plásticas tamaño 7.5 X 7.5, que según la Factura 3655, pretendió cobrar a un precio de $66.92 en vez de al precio pactado de $55.62.

18. El 10 de octubre de 2018, Eco Spectrum entregó a la planta de Century Frozen en Canóvanas 56 cajas de hojas plásticas tamaño 7.5 X 7.5, que según la Factura 3656, pretendió cobrar a un precio de $66.92, en vez de al precio pactado de $55.62.

19. La Sra. Carrasquillo solicitó a Eco Spectrum que corrigiera las Facturas 3655 y 3656 para que reflejaran el precio pactado, que era de $56.62 por unidad de hojas plásticas 7.5 X 7.5, para un total de $3,114.72 por factura.

20. El 10 de octubre de 2018, la Sra. Calero, de Eco Spectrum, respondió a la Sra. Carrasquillo, de Century Frozen, justificando el aumento en que "[d]esde julio de 2018, Donald Trump impuso un aumento de 25% en todo lo que se trae de China. Ese cargo lo impuso EEUU y PR no puede hacer nada sobre el particular. Esto fue algo súbito".

21. La Sra. Carrasquillo respondió que no se le había notificado el aumento en el precio del producto y que,

**si se le hubiera informado oportunamente, hubiera cancelado el resto de la orden.** (Énfasis Suplido)

22. El presidente de Eco Spectrum, Alejandro Cofresí, respondió a la Sra. Carrasquillo reiterándole que el aumento en el precio del producto era por el arbitrio que impuso EEUU sobre las importaciones de ciertos productos de China, y que el resto de sus clientes habían aceptado el aumento en los costos.

23. El Sr. Cofresí admitió que anteriormente, cuando se imponía un aumento en arbitrios de importación, el Gobierno federal lo anunciaba con aproximadamente seis meses de anticipación, lo que daba tiempo al importador a confirmar con sus clientes si deseaban la mercancía a pesar de que conllevaría un aumento en el precio, pero en esta ocasión fue de manera repentina.

24. El Sr. Cofresí admitió que, por lo súbito del aumento en los arbitrios, no hubo tiempo para avisar a los clientes anticipadamente y confirmar si aun así deseaban la mercancía. "Porque como le indiqué, esto fue de sopetón, rápido […] Si aduana me hubiera dado seis meses, yo con tiempo le decía a mi cliente, […] ´Mira, ya le pusieron un aumento. Dentro de seis meses entra en efecto un 25 por ciento, así que pon el orden rápido […]´. Pero eso no fue lo que sucedió.".

25. Entonces, a falta de tiempo para indagar con los clientes si deseaban la mercancía, aunque conllevara un precio mayor distinto al pactado, Eco Spectrum y el Sr. Cofresí reclaman que podían imponer unilateralmente a su cliente la responsabilidad de pagar por el arbitrio, independientemente del precio pactado y que dicho arbitrio no fue ni anticipado oportunamente.

"P. Y esa comunicación con Century Frozen para preguntarle si quiere o no [la mercancía], ¿Se dio?

R. Es que eso no había que hacerlo, señora, licenciada. No es que si la quiere. Es que la tiene que querer porque es una orden presidencial. Se acabó. O sea, ahí no hubo términos, como le indico. Mi presunción en esto es que ahí no hubo términos.

[…]

R. Es que no era decir si o no. Esto no es si o no porque esto es sí o sí, porque es una orden presidencial."

26. Al mismo tiempo, el Sr. Cofresí reconoció que, si el importador no paga por el arbitrio, las consecuencias legales recaen sobre el importador, y no sobre el comprador del producto.

27. El 6 de noviembre de 2018, la Sra. Calero escribió a la Sra. Carrasquillo señalándole que tenían inventario en exceso y que necesitaban que Century Frozen aceptara y pagara la mercancía que estaba en su almacén.

28. La Sra. Carrasquillo respondió a la Sra. Calero que Century Frozen estaba dispuesto a aceptar y pagar por la mercancía ordenada que Eco Spectrum tenía almacenada, pero al precio originalmente pactado, y no al nuevo precio que Eco Spectrum pretendía vendérsela, pues Century Frozen podía adquirir ese mismo material de otros suplidore a un mejor precio.

29. La Sra. Calero respondió a la Sra. Carrasquillo que estaban tratando de resolver la situación identificando a otros suplidores que no trajeran el producto de China, pero que necesitaban resolver el problema del producto que tenían en inventario.

30. El 20 de noviembre de 2018, el Sr. Cofresí envió un correo electrónico a personal de Coca-Cola Puerto Rico Bottlers ("CC1"), solicitando que se le hiciera llegar a su presidente, el Sr. Alberto de la Cruz, alegando que Century Frozen estaba incumpliendo con su contrato al no aceptar las entregas de papel plástico 7.5 X 7.5 y 8 X 9, lo que le representaba un aumento en sus costos de operación por almacenaje.

31. El 28 de noviembre de 2018 la Sra. Carrasquillo envió un correo electrónico a Eco Spectrum indagando cuál sería el precio de venta de las hojas plásticas 7.5 X 7.5 y 8 X 9, a lo que la Sra. Calero respondió que sería $66.92 y $83.43, respectivamente.

32. La Sra. Carrasquillo respondió a la Sra. Calero el 28 de noviembre de 2018 que otros suplidores le ofrecían el producto por $61.60, por lo que no podría comprarles el producto que Eco Spectrum tenía en su almacén.

33. Las últimas facturas entregadas fueron 3655 y 3656 el 4 de octubre de 2018.

34. Century Frozen pagó a Eco Spectrum la cantidad de $3,114.72 por cada una de las Facturas 3655 y 3656.

35. El 5 de diciembre de 2018, el presidente de Eco Spectrum, Alejandro Cofresí, envió una carta al gerente general de Century Frozen, Mario Chalas, informándole se pagó una cantidad menor que la facturada en las Facturas 3655 y 3656; que el nuevo precio respondía a la imposición de un arbitrio de 25% a los productos importados de China, y que el resto de sus clientes habían aceptado asumir el aumento.

Siendo así, el Foro de Instancia concluyó que, luego de evaluada la posición de todas las partes, no existen controversias de hechos medulares de los hechos esenciales del caso, mas bien, solo resta resolver a quien le corresponde absorber el aumento en el arbitrio de importación. Por su parte, el Tribunal de Primera Instancia entendió que ante el incumplimiento de Eco Spectrum en un elemento sustancial del contrato como lo es el precio pactado, Century Frozen no estaba obligado a cumplir con su parte del contrato. Además, entendió que Century Frozen no tiene responsabilidad para con el arbitrio, esto debido a que el mismo no fue parte del contrato inicial, ni se estableció una clausula de aumento en caso de que se impusiera algún arbitrio adicional, por lo que estos constituyen un gasto del negocio del cual la Parte Apelada no tiene ninguna responsabilidad. En cuanto a las facturas 3655 y 3656, el Tribunal de Primera Instancia concluyó que Eco Spectrum aceptó los pagos que hizo Century Frozen, por lo que es de aplicación la figura de pago en finiquito, siendo así, Century Frozen no tiene ninguna deuda con Eco Spectrum.

Ahora bien, el 8 de junio de 2023, Eco Spectrum presentó *Moción en Solicitud de Reconsideración y en Solicitud de Determinaciones de Hechos y Derecho Adicionales*. Arguyó que el caso presentado no había sido uno frívolo, ya que la controversia presentada era justiciable y que el Foro Instancia no había resuelto

en cuanto a quién le correspondía pagar los arbitrios de importaciones. Por su parte, el Foro de Instancia le proveyó un término de 20 días a la parte apelada para que replicara. El 28 de junio de 2023, Century Frozen presentó *Oposición a Moción de Reconsideración.* Siendo así, el 29 de junio de 2023 el Foro primario declaro no ha lugar la *Moción de Reconsideración* presentada por Eco Spectrum.

Insatisfecho con la determinación, Eco Spectrum recurrió ante este foro apelativo y planteó la comisión de los siguientes errores a saber:

**PRIMER ERROR:** Erró el Tribunal de Primera Instancia al no resolver la controversia medular de derecho en el caso sobre si a las partes demandadas le correspondía pagar el impuesto presidencial.

**SEGUNDO ERROR**: Erró el Tribunal de Primera Instancia al aplicar la doctrina de *non rite adimpleti contractus.*

**TERCER ERROR**: Erró el Tribunal de Primera Instancia al no determinar que la parte demandada tenía manos sucias, lo que ocasiona impedimento por actos propios.

**CUARTO ERROR**: Erró el Tribunal de Primera Instancia al no aplicar la doctrina de enriquecimiento injusto al caso de autos.

**QUINTO ERROR:** Erró el Tribunal de Primera Instancia al aplicar erróneamente el mecanismo de Sentencia Sumaria al existir controversia de hechos e incumplir con requisitos de forma de la solicitud.

**SEXTO ERROR**: Erró el Tribunal de Primera Instancia al determinar que el presente caso es un pleito frívolo, cuando es una controversia justiciable, e impuso el pago de $5,000.00 de honorarios de abogado.

**SEPTIMO ERROR**: Erró el Tribunal de Primera Instancia al declarar Ha Lugar la Solicitud de Sentencia Sumaria, sin haber tenido oportunidad de escuchar las partes y examinar la prueba.

**OCTAVO ERROR**: Erró el Tribunal de Primera Instancia al declarar No Ha Lugar la Solicitud de Reconsideración, presentada por la parte demandante/apelante/compareciente a apenas un día de la presentación de la Oposición.

## II

### A. *Sentencia Sumaria*

La Sentencia Sumaria es un mecanismo procesal que tiene como propósito la solución, justa, rápida y económica de los litigios civiles que no contengan controversias de hechos materiales y, por lo tanto, no ameritan la celebración de un juicio en su fondo. La Regla 36.1 de Procedimiento Civil[4] establece que las partes podrán presentar una moción fundada en declaraciones juradas o en aquella evidencia que demuestre la inexistencia de una controversia sustancial de hechos esenciales y pertinentes, para que el tribunal dicte sentencia sumariamente a su favor sobre la totalidad o cualquier parte de la reclamación solicitada. La Sentencia Sumaria es una excepción al juicio mediante testimonios vivos frente al juzgador de los hechos.[5] La parte que solicita la Sentencia Sumaria tiene la responsabilidad de demostrar de manera clara que el promovido no puede prevalecer mediante ningún supuesto de hechos y que el tribunal cuenta con la verdad sobre todos los hechos necesarios para resolver la controversia ante su consideración.[6]

Por su parte, el Tribunal tiene discreción para conceder o no la Sentencia Sumaria, ya que el mal uso de esta puede despojar a un litigante de su día en corte, lo cual coartaría su debido proceso de ley.[7] Es por lo anterior, que no es aconsejable que se utilice el mecanismo de Sentencia Sumaria cuando hay elementos subjetivos que deban ser evaluados por el juzgador. No obstante, el Tribunal puede utilizar el mecanismo de Sentencia Sumaria, aun cuando hay elementos subjetivos, si la evidencia que será considerada en la solicitud surge que no existe controversia en cuanto a los hechos

---

[4] 32 LPRA Ap. V, R. 36.1.
[5] *SLG Zapata-Rivera v. J.F. Montalvo*, 189 DPR 414, 430 (2013).
[6] *Id.*
[7] *Roing Com. Bank v. Rosario Cirino*, 126 DPR 613, 617 (1990).

materiales [8] Ahora bien, antes de utilizar el mecanismo de Sentencia Sumaria, el Tribunal debe evaluar lo siguiente:

> (1) analizará los documentos que acompañan la moción solicitando la Sentencia Sumaria y los documentos incluidos con la moción en oposición y aquellos que obren en el expediente del tribunal, (2) determinará si el oponente controvirtió algún hecho materia o si hay alegaciones de la demanda que no han sido controvertidas o refutadas en forma alguna por los documentos.[9]

Anteriormente discutimos que, el fin de la Sentencia Sumaria es aligerar la tramitación del caso, permitiendo al Tribunal disponer de un caso sin la celebración de una vista en sus méritos. Sin embargo, al dictar Sentencia Sumaria no se puede poner en peligro o lesionar los intereses de las partes. Es por eso que, si existen dudas sobre la existencia de controversias de hechos estas deben resolverse en contra de la parte que solicita la Sentencia Sumaria. El Tribunal de Primera Instancia no podrá dictar Sentencia Sumaria cuando "(1) existan hechos materiales y esenciales controvertidos, (2) hay alegaciones afirmativas en la demanda que no ha sido refutadas, (3) surge de los propios documentos que se acompañan con la moción una controversia real sobre hecho material y esencial o (4) como cuestión de derecho no procede."[10]

Ahora bien, si la otra parte desea derrotar una moción de Sentencia Sumaria, deberá presentar declaraciones juradas y documentos que pongan en controversia los hechos presentados por el promovente.[11] No obstante, el solo hecho de no presentar evidencia que controvierta la presentada por el promovente, no implica necesariamente que procede la Sentencia Sumaria. Los jueces tienen el deber de evaluar toda la evidencia, incluso aquella que no haya formado parte de la solicitud.[12]

---

[8] *SLG Zapata-Rivera v. J.F. Montalvo, supra.*
[9] *Management Administration Services,* Corp v. ELA, 152 DPR 599, 611 (2000).
[10] *Id*
[11] *PFZ Props, Inc v Gen, Acc Ins. Co.* 136 DPR 881, 912 (1994).
[12] *Vera v. Dr. Bravo,* 161 DPR 308, 333(2004).

En cuanto al estándar aplicable al Tribunal de Apelaciones al momento de revisar las determinaciones del foro primario de conceder o denegar mociones de Sentencia Sumaria, se ha establecido que debemos realizar una evaluación *de novo* de la controversia.[13] En ese análisis, estamos facultados a considerar los documentos que se presentaron ante el foro primario, determinar si existe o no alguna controversia genuina de hechos materiales, y revisar si se aplicó el derecho de forma correcta.[14]

**B. *Contratos***

Para que un contrato sea válido este debe contener el consentimiento de los contratantes, un objeto cierto y causa de la obligación que se establezca.[15] El consentimiento se manifiesta por el concurso de la oferta y la aceptación sobre la cosa y la causa que han de constituir el contrato.[16] Los contratos se perfeccionan por el mero consentimiento, y desde entonces obligan. Siendo así, una vez perfeccionado dicho contrato, éste tiene fuerza de ley entre las partes. En nuestra jurisdicción opera el principio de libertad de contratación.[17] El Art. 1207 del Código Civil de Puerto Rico de 1930 establece que, "[l]os contratantes pueden establecer los pactos, cláusulas y condiciones que tengan por conveniente, siempre que no sean contrarios a las leyes, a la moral, ni al orden público."[18] Por tanto, los contratos serán obligatorio, cualquiera que sea la forma que se hayan celebrado, siempre que en ellos concurran las condiciones esenciales para su validez. [19]

---

[13] *Meléndez González et al. V. M. Cuebas*, 193 DPR 100 (2015).
[14] *Id.*
[15] Art. 1213, Código Civil de Puerto Rico de 1930, 31 LPRA sec. 3391. Debido a que los hechos ocurrieron en 2017, hacemos constar que es de aplicación el Código Civil de 1930, el cual fue derogado por el Código Civil de 2020.
[16] Art. 1214 Código Civil de Puerto Rico de 1930, 31 LPRA sec. 3401.
[17] Art. 1044 de Código Civil de Puerto Rico de 1930, 31 LPRA sec. 2995.
[18] Código Civil de Puerto Rico de 1930, 31 LPRA sec. 3372.
[19] Art. 1230, Código Civil de Puerto Rico de 1930, 31 LPRA sec. 3451.

Siendo así, el Art. 1053 del Código Civil de Puerto Rico de 1930[20], establece que en las obligaciones recíprocas ninguno de los obligados incurre en mora si el otro no cumple o no se allana a cumplir debidamente lo que le incumbe. El Tribunal Supremo de Puerto Rico ha adoptado mediante jurisprudencia, una excepción al cumplimiento adecuando o parcial del contrato llamada *non rite adimpleti contractus*. Esta excepción aplica en caso de que una de las partes haya cumplido la prestación parcial o defectuosa sin ajustarse de forma debida a lo que exige el vínculo obligatorio.[21] "La *exceptio non rite adimpleti constractus* es una defensa disponible el demandado, oponible al demandante que pretende exigir el cumplimiento de una obligación a pesar de que él ha cumplido parcial o defectuosamente con su prestación."[22] En consecuencia, una parte no puede exigir el cumplimiento de la obligación, mientras la otra parte no haya cumplido con su prestación total y libre de defectos. Ahora bien, esta excepción puede ser invocada por el demandado en los casos en que "el demandante pretende exigir el cumplimiento de una obligación a pesar de que él ha cumplido parcial o defectuosamente con su prestación, y su efecto será que el demandado no estará obligado a cumplir con su parte hasta tanto, el demandante cumpla con la suya."[23]

Por otra parte, el Art. 7 del Código Civil de Puerto Rico de 1930[24], dispone que cuando no hay ley aplicable al caso el Tribunal tiene el deber de aun así resolver, mediante equidad. Es decir, que tendrá en cuenta la razón natural de acuerdo con los principios generales del derecho, los usos y las costumbres aceptados y establecidos. A raíz de este artículo, nuestro Tribunal Supremo ha creado ciertas doctrinas con el propósito de impartir justicia en

---

[20] Art. 1053, Código Civil de Puerto Rico de 1930, 32 LPRA sec. 3017.
[21] *Álvarez v. Rivera,* 165 DPR 1, 21 (2005).
[22] Id., pág. 22.
[23] *Id.*
[24] 31 LPRA sec. 7.

aquellas áreas en las que el derecho es silencioso, obscuro o ineficiente.

Como consecuencia de lo anterior, nace la doctrina de actos propios, la cual busca proteger la buena fe que debe prevalecer en las relaciones jurídicas, en el ejercicio de los derechos y el cumplimiento de las obligaciones. Es por lo anterior, que el Tribunal Supremo ha establecido que la conducta contradictoria no tiene lugar en el campo del derecho por lo que, debe ser impedida[25]. En base a lo anterior, se adoptaron tres (3) elementos, para la aplicación de la doctrina de actos propios, estos son los siguientes:

> (a) una conducta determinada de un sujeto, (b) que haya engendrado una situación contraria a la realidad, es aparente y mediante tal apariencia, susceptible de influir en la conducta de los demás y (c) que sea base la confianza de otra parte que ha procedido de buena fe y que, por ello, haya otorgado de una manera que le causaría un perjuicio si su confianza quedara defraudada.[26]

El Tribunal Supremo, expresó que, "[e]ste principio tiene como paralelo en el Derecho inglés la doctrina de estoppel. El típico efecto mínimo que debe reconocerse a los actos unilaterales es que dejan fundado un estoppel. Este evita que el sujeto al que es imputable el acto unilateral pueda actuar en contradicción con su voluntad declarada."[27]

En nuestra jurisdicción se ha adoptado mediante equidad la figura de enriquecimiento injusto. El tribunal Supremo establece que, "[a]l igual que otras acciones basadas en los principios de equidad, la reclamación por enriquecimiento injusto solo procederá cuando no exista ley que provea para otra causa de acción."[28] Ahora bien, para que constituya la doctrina de enriquecimiento injusto, es necesario que se cumpla con cierto requisitos establecidos por el

---

[25] *Vivoni Farage v. Ortíz Carro*, 179 DPR 990, 1111, (2010).
[26] *Int. General Electric v. Concrete Builders*, 104 DPR 871, 878 (1976).
[27] *Id.*, pág. 878-879.
[28] *ELA v. Cole*, 164 DPR 608, 633 (2005).

Tribunal Supremo que son los siguientes: "(i) existencia de un enriquecimiento; (ii) un correlativo empobrecimiento; (iii) una conexión entre dicho empobrecimiento y enriquecimiento; (iv) falta de una causa que justifique el enriquecimiento, y (v) inexistencia de un precepto legal que excluya la aplicación del enriquecimiento sin causa."[29] Es importante destacar que la doctrina de enriquecimiento injusto no puede ser invocada por el gestor de mala fe, ni se aplicará cuando resulte contraria a una clara política pública plasmada en un estatuto de la constitución.[30]

## C. *Reconsideración*

La Regla 47 de Procedimiento Civil[31], establece el proceso a seguir para la presentación de una Reconsideración, como es bien sabido, la parte adversamente afectada posee un término de 15 días, a partir de la notificación de la sentencia, para presentar la Reconsideración. Sin embargo, nada dice la regla en cuanto al tiempo que tiene el Tribunal de Primera Instancia para resolver una Moción de Reconsideración. Mas bien, el Foro de Instancia posee discreción para resolver una Moción de Reconsideración.

## D. *Frivolidad y honorarios de abogados*

La Regla 44.1(d) de Procedimiento Civil nos dice que:

(d) *Honorarios de abogado.* En caso que cualquier parte o su abogado o abogada haya procedido con temeridad o frivolidad, el tribunal deberá imponerle en su sentencia al o a la responsable el pago de una suma por concepto de honorarios de abogado que el tribunal entienda correspondan a tal conducta. En caso que el Estado Libre Asociado de Puerto Rico, sus municipios, agencias o dependencias haya procedido con temeridad o frivolidad, el tribunal deberá imponerle en su sentencia una suma por concepto de honorarios de abogado, excepto en los casos en que esté expresamente exento por ley del pago de honorarios de abogado.[32]

---

[29] *Id.*
[30] *Ortíz Andujar v. ELA*, 122 DPR 817, 823 (1988).
[31] 32 LPRA Ap. V, R.47.
[32] 32 LPRA Ap. V, Regla 44.1(d).

El Tribunal Supremo ha determinado que no procede la imposición de honorarios en todos los casos, únicamente en aquellos que el tribunal entienda que la parte perdidosa o su abogado actuaron con temeridad o frivolidad. Siendo así, es necesario que, al momento de imponer honorarios, el tribunal evalúe factores tales como la naturaleza del litigio, las cuestiones de derecho envueltas en el mismo, la cuantía en controversia, el tiempo invertido, los esfuerzos y actividad profesional que hayan tenido que desplegarse y la habilidad y reputación de los abogados envueltos.

Sin embargo, no existe temeridad o frivolidad cuando se trata de un planteamiento complejo y novedoso, no resuelto en nuestra jurisdicción. Ahora bien, el hecho de que el punto resulte nuevo no constituye "carta blanca" para actuar en forma temeraria o frívola. Ante una situación de hechos innegables o un estado de derecho claro, el hecho de que se trate de un asunto nunca antes considerado no constituye excusa para una acción frívola o temeraria. Siendo así, procede la imposición de honorarios cuando el pleito pudo haber sido evitado. [33] Sin embargo, es importante destacar que la imposición de honorarios de abogado es una discrecional del tribunal.[34] Por todo lo cual, procedemos a discutir los errores presentados.

III

Inicialmente discutiremos en conjunto el **quinto** y **séptimo** error por estar íntimamente relacionados entre sí.

En el caso presentado ante nos, la parte peticionaria alega que erró el Tribunal de Primera Instancia al aplicar el mecanismo de Sentencia Sumaria cuando existían alegadas controversias de hechos pendientes y se había incumplido con los requisitos de forma de la solicitud. Además, planteó que, el Foro de Instancia erró al

---

[33] *Corpak, Art Printing v. Ramallo Brothers*, 125 DPR 724, 737-739 (1990).
[34] *Vega v. Luna Torres*, 126 DPR 370, 373 (1990).

declarar ha lugar la solicitud de Sentencia Sumaria sin haber escuchado a las partes y sin examinar la prueba.

Como antes discutimos, la Sentencia Sumaria tiene como propósito brindar una solución justa, rápida y económica en los pleitos civiles que no contengan controversias de hechos sustanciales sin la necesidad de celebrar un juicio en su fondo. La parte promovente tendrá que presentar evidencia junto con la moción que sustente sus alegaciones y demuestre que no existe una controversia de hechos sustancial. Ahora bien, si la parte contraria desea refutar la Moción de Sentencia Sumaria deberá demostrar con evidencia, la existencia de controversias de hechos materiales en el caso. Por su parte, el Tribunal Apelaciones tiene el deber de evaluar *de novo*, por lo que debemos evaluar la evidencia presentada ante el Tribunal de Primera Instancia y determinar si en efecto se cumplen con los requisitos de la Sentencia Sumaria.

En el presente caso, el Foro de Instancia exhortó a las partes a presentar las mociones dispositivas luego de que el Tribunal acogiera el *Informe de Conferencia con Antelación a Juicio.* En dicho informe, las partes realizaron varias estipulaciones de hechos y sometieron un sinnúmero de evidencia. Luego de presentado, Century Frozen solicitó al Tribunal que dispusiera del caso sumariamente por entender que no existían controversias de hechos materiales. Eco Spectrum se opuso, sin embargo, no demostró la existencia de controversias de hechos. Siendo así, el Tribunal de Primera Instancia determinó "Ha Lugar" la Solicitud de Sentencia Sumaria presentada. **A lo que entendemos que le asiste la razón**. Según se desprende del expediente en el caso ante nos, no existen controversias de hechos sustanciales que amerite la celebración de un juicio. Las alegaciones de Eco Spectrum se limitan a dirimir la controversia en cuanto a la responsabilidad de pago del impuesto

presidencial, lo que entendemos no es una controversia de hechos materiales.

En la solicitud de Sentencia Sumaria presentada por Century Frozen se adjuntaron varios documentos los cuales fueron evaluados por este foro para determinar si procede o no disponer sumariamente de este caso. Siendo así, evaluamos las órdenes de compras realizadas por las partes y los comunicados que compartieron las partes de los cuales no se desprende que exista una controversia de hechos materiales. De hecho, surge de tal evidencia que las partes otorgaron un contrato mediante las órdenes realizadas, que la entrega a estas órdenes se retrasó por lo menos un año y que la única controversia que resta por resolver es a cual de las partes le corresponde asumir el pago del arbitrio impuesto al producto una vez llegó a Puerto Rico. Siendo así, entendemos que el Tribunal de Primera Instancia no erró al declarar con lugar la solicitud de Sentencia Sumaria.

A continuación, por estar íntimamente relacionados a la materia de contratos discutiremos en conjunto los errores segundo, tercero y cuarto.

Eco Spectrum alegó que erró el Tribunal de Primera Instancia al aplicar la doctrina de *non rite adimpleti contractus* y al determinar que no procedía la doctrina de enriquecimiento injusto ni la de impedimento por actos propios.

En este caso, las partes realizaron una orden, en la cual se solicitaba la entrega de un producto por un precio determinado. Si bien es cierto, las partes no firmaron un contrato escrito y ambos consintieron a la Orden realizada, por lo que, esta se convierte en el contrato, ya que para que un contrato sea válido no es necesario que se otorgue de una u otra forma, solo basta con que contenga consentimiento, objeto y causa. Siendo así, habiendo las partes perfeccionadas el contrato, estas quedaron obligadas a cumplir con

lo pactado, sin importar la forma en la que fue realizado, según dispone el Art. 1230.[35]

Por otro lado, el Código Civil nos señala que cuando las obligaciones son recíprocas las partes no incurrirán en mora, si la otra incumple con lo pactado. Por su parte, el Tribunal Supremo adoptó la excepción de *non rite adimpleti contractus,* la cual se da cuando **una parte cumple parcial o defectuosamente su obligación**.[36](Énfasis Nuestro). Como consecuencia, la parte que incumple no puede exigir el cumplimiento del contrato. De los hechos planteados surge que las partes pactaron la entrega de un producto por un precio determinado. Según lo esbozado en el expediente, Century Frozen realizó varios acercamientos extrajudiciales con el propósito de conocer el "status" de su orden, ya que llevaba varios meses de retraso, a lo que Eco Spectrum le contestaba que ya estaba en camino. No obstante, el producto no fue entregado hasta un año después, cuando se suponía que este sería entregado en tres meses, aproximadamente.

Siendo así, el 10 de octubre de 2018, se le hizo entrega parte del pedido a Century Frozen, junto con dos facturas que representaban un aumento en el valor del producto. Por lo que, Century Frozen procede a enmendar las facturas con el precio originalmente pactado y emite el pago. Eco Spectrum justificó el aumento dado a que, en julio de 2018, el presidente Donald Trump había autorizado, de formar inmediata, un impuesto del 25% a las importaciones provenientes de la República de China. Sin embargo, nunca se le notificó a Century Frozen del aumento, sino que, lo enmendó unilateralmente.

A tenor con lo anterior, Eco Spectrum fue el primero en incumplir con lo pactado al demorar irrazonablemente la entrega del

---

[35] Art. 1230, Código Civil de Puerto Rico de 1930, 31 LPRA sec. 3451
[36] *Álvarez v. Rivera, supra.*

producto y luego al enmendar el precio originalmente pactado unilateralmente. Es por esto que entendemos que **actuó correctamente el Tribunal de Primera Instancia al determinar que procedía aplicar la excepción de** *non rite adimpleti contractus, por lo que Eco Sprecturm* **está impedido de exigir el cumplimiento de lo pactado.**

Ahora bien, en cuanto a los planteamientos de error sobre las doctrinas de enriquecimiento injusto y actos propios, entendemos son improcedentes ya que, las controversias planteadas en este caso se encuentran totalmente reguladas por nuestro Código Civil. Por su parte, el propósito de las doctrinas en equidad es regular áreas en el derecho que son silenciosas u obscuras. Por lo que, no es correcto aplicar dichas doctrinas, cuando nuestro ordenamiento jurídico provee un remedio para ello.

Procedemos a discutir el **sexto error**, en el cual la Parte Apelante alega que actuó incorrectamente el Tribunal de Primera Instancia al determinar que este caso era uno frívolo e imponer $5,000.00 por concepto honorarios de abogados.

La Regla 44.1(b) de Procedimiento Civil señala que el Tribunal deberá imponer honorarios de abogados en cualquier caso en el que las partes actúen con temeridad o frivolidad. Ahora bien, no procede la imposición de honorarios de abogados en todos los casos, por lo que el Tribunal deberá evaluar factores como la naturaleza del litigio, las cuestiones de derecho envueltas, la cuantía en controversia, entre otras. Sin embargo, no existe frivolidad cuando se trata de un planteamiento novedoso; es importante destacar que, el ser considerado novedoso no constituye excusa para actuar de manera frívola. En el caso *Vega v. Luna Torres*[37], el Tribunal

---

[37] *Vega v. Luna Torres, supra.*

Supremo resolvió que la imposición de honorarios es una determinación discrecional del Tribunal.

Según lo discutido anteriormente, el Foro de Instancia tiene discreción para otorgar honorarios de abogados, así como ordenar una cuantía basada en su discreción. En la Sentencia Sumaria emitida por el Tribunal de Primera Instancia se otorgaron honorarios de abogados por considerar el caso uno frívolo. No obstante, el Foro de Instancia no fundamentó su decisión. Como antes discutimos, la imposición de honorarios de abogados no puede ser una automática para la parte que prevalece, por lo que el Tribunal debe evaluar si en realidad las partes actuaron de manera frívola. En el presente caso, las partes radicaron una causa de acción justiciable y han sido diligentes en su actuación. No surge del expediente que las partes hayan dilatado los procesos. Por el contrario, desde un inicio mostraron interés de disponer sumariamente del caso. Las actuaciones de las partes, que se desprenden del expediente, no muestran ningún grado de temeridad que amerite la imposición de honorario de abogados. Por lo que entendemos que no procede la determinación de frivolidad realizada por el Tribunal de Primera Instancia.

Por otro lado, como **octavo error**, la Parte Apelante plantea que el Foro de Instancia no actuó correctamente al declarar no ha lugar la *Moción de Reconsideración* presentada cuando solo había trascurrido un día de la presentación. La Regla 47 de Procedimiento Civil[38], no impone un término al Tribunal de Primera Instancia para disponer de una *Moción de Reconsideración*. De hecho, esta determinación es una discrecional del Tribunal de Primera Instancia. Por lo que, no erró el Foro de Instancia al declarar no ha lugar la *Moción de Reconsideración* con apenas un día de radicada.

---

[38] 32 LPRA Ap III, *supra.*

Ahora bien, como **primer error** la Parte Apelante alega que el Tribunal de Primera Instancia erró al no resolver la controversia medular de derecho en el caso sobre a cuál de las partes le corresponde pagar el impuesto presidencial. Sin embargo, en la Sentencia Sumaria emitida por el Tribunal de Primera Instancia, se resuelve lo siguiente: "Esos arbitrios constituyen un costo de negocio de Eco Spectrum por lo cual Century Frozen no es responsable por no haber formado parte del contrato". **Por lo que, entendemos que sí se hizo una determinación al respecto.**

IV

Por los fundamentos que anteceden, los que hacemos formar parte de este dictamen, modificamos la "Sentencia Sumaria" apelada emitida por el Tribunal de Primera Instancia, Sala Superior de Carolina, en cuanto a que revocamos la imposición de honorarios por temeridad y así modificada se confirma.

Lo acordó y manda el Tribunal y lo certifica la Secretaria del Tribunal de Apelaciones.

Lcda.  Lilia M. Oquendo Solís
Secretaria del Tribunal de Apelaciones