Estado Libre Asociado de Puerto Rico
TRIBUNAL DE APELACIONES
PANEL ESPECIAL

| | | |
|---|---|---|
| ASHLEY MARIE RIVERA RIVERA, KELVIN O. RIVERA RIVERA, CLARYVETTE RIVERA ESPADA, LUZ ENID RIVERA ESPADA, LUZ ARACELI RIVERA ESPADA, JULIO RIVERA ESPADA, MIGUEL RIVERA ESPADA, WILLIAM RIVERA ESPADA, LUIS MATEO CRUZ y MARIANGELY RIVERA RIVERA<br><br>Apelantes<br><br>v.<br><br>HOSPITAL SAN CRISTÓBAL, DR. AURELIO GARCÍA, SOCIEDAD LEGAL DE BIENES GANANCIALES COMPUESTA POR DR. AURELIO GARCÍA, JANE DOE GARCÍA, DRA. GLORIMAR MARTÍNEZ ORTIZ, SOCIEDAD LEGAL DE BIENES GANANCIALES COMPUESTA POR DRA. GLORIMAR MARTÍNEZ Y JOHN DOE MARTÍNEZ, DRA. MARIELA PÉREZ QUINTANA, SOCIEDAD LEGAL DE BIENES GANANCIALES COMPUESTA POR DRA. MARIELA PÉREZ QUINTANA Y JOHN DOE PÉREZ, JOHN DOE PÉREZ, COMPAÑIAS ASEGURADORAS X, Y, Z, DR. JOHN DOE, DR. RICHARD DOE, QUALITY HEALTH SERVICES OF PUERTO RICO, INC. Y MED PRO GROUP<br><br>Apelados | TA2025AP00148 | *Apelación procedente del Tribunal de Primera Instancia, Sala Superior de Ponce*<br><br>Sobre: Impericia Médica<br><br>Caso núm.: PO2021CV01907 |

Panel integrado por su presidente, el Juez Marrero Guerrero, el Juez Campos Pérez y el Juez Robles Adorno.[1]

Robles Adorno, Juez Ponente.

---

[1] Véase OATA-2025-170 del 3 de septiembre de 2025 en la que se designa al Juez Robles Adorno en sustitución del Juez Rodríguez Casillas.

**SENTENCIA**

En San Juan, Puerto Rico, a 19 de diciembre de 2025.

El 18 de julio de 2025, las señoras Ashley Marie Rivera Rivera, Claryvethe Rivera Espada, Luz Enid Rivera Espada, Luz Araceli Rivera Espada, y los señores Kelvin O. Rivera Rivera, Julio Rivera Espada, Miguel Rivera Espada, William Rivera Espada y Luis Mateo Cruz (en conjunto, la parte apelante), instaron un recurso de *Apelación* en el que solicitaron que revoquemos la *Sentencia* emitida el 4 de junio de 2025, y notificada el 5 de junio de 2025, por el Tribunal de Primera Instancia, Sala Superior de Ponce (TPI o foro primario).[2] En el aludido dictamen, el TPI declaró *No ha lugar* la causa de acción por daños y perjuicios e impericia médica presentada por la parte apelante.

Por los fundamentos que exponemos a continuación, confirmamos la *Sentencia* apelada.

**I.**

El caso de autos tuvo su inicio el 17 de agosto de 2021, cuando la parte apelante presentó una *Demanda* en contra del Hospital San Cristóbal (el Hospital), la doctora Glorimar Martínez Ortiz (la doctora Martínez Ortiz), y el doctor Aurelio García Medina (el doctor García Medina o parte apelada).[3] En síntesis, expuso que, el 31 de agosto de 2020, la señora Marilyn Rivera Espada (la señora Rivera Espada) fue llevada en ambulancia al Hospital San Cristóbal, en Ponce, luego de sufrir un percance de salud en un centro comercial.

En esa línea, indicó que, la doctora Martínez Ortiz recibió a la señora Rivera Espada en la sala de emergencias y que a esta se le realizó un *CT Scan*, el cual reveló que había sufrido un accidente cerebrovascular. Asimismo, la parte apelante esgrimió que la

---

[2] Entrada Núm. 152 del caso PO2021CV01907 en el Sistema Unificado de Manejo y Administración de Casos (SUMAC).

[3] Entrada Núm. 1 del caso PO2021CV01907 en el SUMAC.

doctora Martínez Ortiz le informó, a la señora Rivera Espada, que en la institución hospitalaria no había un neurólogo disponible. Ante ello, el doctor García Medina, médico internista, ordenó la hospitalización de la señora Rivera Espada. Igualmente, la parte apelante resaltó que los estudios realizados durante dicha hospitalización demostraron lesiones compatibles con una trombosis y no se le practicó una profilaxis.

Desafortunadamente, surge de la *Demanda* que, el 2 de septiembre de 2020, la señora Rivera Espada falleció a causa de un *stroke* cerebrovascular y una embolia pulmonar. Consecuentemente, adujo que el Hospital, la doctora Martínez Ortiz, y la parte apelada debían responder por los daños y perjuicios sufridos a causa de la muerte de la señora Marilyn Rivera Espada. Por ende, la parte apelante solicitó una indemnización global de más de tres (3) millones de dólares.

El 15 de noviembre de 2021, el doctor García Medina presentó una *Contestaci[ó]n a Demanda*,[4] y, el 19 de noviembre de 2021, la doctora Martínez Ortiz radicó una *Contestación a Demanda.*[5] Asimismo, el 24 de noviembre de 2021, el Hospital instó su *Contestación a Demanda.*[6] Todos rechazaron, en su mayoría, las imputaciones de negligencia hechas en su contra.

Tras varios incidentes procesales,[7] el 10 de octubre de 2024, la parte apelante presentó una *Moción de Desistimiento Voluntario Parcial con Perjuicio En Cuanto a Ciertos Co-Demandados.*[8] Específicamente, desistió de la causa de acción instada en contra del Hospital, de Quality Health Services of Puerto Rico, Inc., su

---

[4] Entrada Núm. 21 del caso PO2021CV01907 en el SUMAC.
[5] Entrada Núm. 23 del caso PO2021CV01907 en el SUMAC.
[6] Entrada Núm. 25 del caso PO2021CV01907 en el SUMAC.
[7] Entre los que destacamos que la parte apelante presentó dos (2) demandas enmendadas. *Véanse* las Entradas Núm. 33 y 73 del caso PO2021CV01907 en el SUMAC.
[8] Entrada Núm. 122 del caso PO2021CV01907 en el SUMAC.

administradora,[9] y The Medical Protective Company, su aseguradora,[10] a raíz de un acuerdo transaccional alcanzado. Cónsono con lo anterior, ese mismo día, el foro primario dictó una *Sentencia Parcial* en la que ratificó el desistimiento anunciado.[11]

El 9 de abril de 2025, la parte apelante y la doctora Martínez Ortiz presentaron conjuntamente un documento intitulado *Acuerdo Sobre Estipulación Parcial Privada*.[12] En síntesis, informaron que alcanzaron un acuerdo transaccional, y, cónsono con ello, el 24 de abril de 2025, la parte apelante presentó una *Moción de Desistimiento Voluntario con Perjuicio*.[13] Ante ese cuadro, el 2 de mayo de 2025, notificada el 7 de mayo de 2025, el TPI emitió una *Sentencia Parcial* en la que autorizó el desistimiento anunciado.[14]

Así las cosas, el juicio en su fondo, en cuanto al demandado remanente se celebró los días 6, 7, 12, 13 y 24 de marzo de 2025. La parte apelante presentó, como prueba testifical, los testimonios del doctor García Medina, las señoras Ashley Rivera Rivera, Claryvette Rivera Espada, Mariangely Rivera Rivera, Luz E. Rivera Espada, Luz A. Rivera Espada, los señores Kelvin O. Rivera Rivera, Miguel Rivera Espada, Julio A. Rivera Espada, William Rivera espada y Luis Mateo Cruz, así como los testimonios periciales de los doctores Christian E. Schenk Aldahondo y Manuel Quiles Lugo. Por su lado, la parte apelada, presentó el testimonio del doctor García Medina y el testimonio pericial del doctor Luis J. Rivera Ramos.[15]

---

[9] Incluida como codemandada el 3 de marzo de 2022, en la primera demanda enmendada. *Véase* Entrada Núm. 33 del caso PO2021CV01907 en el SUMAC.

[10] Incluida como codemandada el 2 de noviembre de 2022, en la segunda demandada enmendada. *Véase* Entrada 73 del caso PO2021CV01907 en el SUMAC.

[11] Entrada Núm. 123 del caso PO2021CV01907 en el SUMAC.

[12] Entrada Núm. 144 del caso PO2021CV01907 en el SUMAC.

[13] Entrada Núm. 146 del caso PO2021CV01907 en el SUMAC.

[14] Entrada Núm. 147 del caso PO2021CV01907 en el SUMAC.

[15] Asimismo, cabes destacar que se admitió la siguiente prueba documental: **Exhibit 1** (récord médico Hospital San Cristóbal); **Exhibit 2** (hoja de incidencias de emergencias médicas); **Exhibit 3** (*curriculum vitae* del doctor Schenk Aldahondo); **Exhibit 4** (*curriculum vitae* del doctor Quiles Lugo); **Exhibit 5** (*curriculum vitae* del doctor Rivera Ramos); **Exhibit 6** (*curriculum vitae* del doctor Carlos Gómez Marcial), como prueba estipulada; **Exhibit 1** (informe pericial del doctor Schenk Aldahondo); **Exhibit 2** (informe pericial del doctor Quiles Lugo), de

En adición, cabe destacar que, una vez la parte apelante sometió su caso, el doctor García Medina solicitó la desestimación del caso por insuficiencia de prueba, solicitud que el foro primario determinó no resolver en esos momentos.

Evaluado el caso ante su consideración, el 4 de junio de 2025, notificada el 5 de junio de 2025, el TPI emitió la *Sentencia* de la cual se apela, mediante la que declaró *no ha lugar* la causa de acción de la parte apelante.[16] Tras aquilatar la prueba testifical y documental, el foro primario realizó noventa y nueve (99) determinaciones de hechos.

En síntesis, el TPI determinó que la parte apelante no pudo rebatir la presunción de corrección que le cobijaba al doctor García Medina. En ese sentido, resolvió que la parte apelada no se apartó de las normas de conducta médica, sino que cumplió con las exigencias médicas reconocidas y le brindó a la señora Rivera Espada un tratamiento adecuado. De ese modo, el TPI concluyó que no se probó la causa de acción por impericia médica.

Insatisfecha, el 18 de junio de 2025, la parte apelante presentó una *Moción Solicitando Determinaciones y/o Enmiendas de Hechos Adicionales, Conclusiones de Derecho y Moción de Reconsideración.*[17] En esencia, reiteró su contención en cuanto a que la parte apelada se apartó de la buena práctica de la medicina y ello causó directamente los daños y la muerte de la señora Rivera Espada. Asimismo, resaltó que la embolia pulmonar era altamente previsible y prevenible, del doctor García Medina haber actuado conforme a los estándares de su profesión. En ese sentido, solicitó al foro primario que determinara ochenta y ocho (88) hechos

---

la parte apelante; y **Exhibit 1** (informe pericial del doctor Rivera Ramos), de la parte apelada.
[16] Entrada Núm. 152 del caso PO2021CV01907 en el SUMAC.
[17] Entrada Núm. 155 del caso PO2021CV01907 en el SUMAC.

adicionales, enmendara las determinaciones de hechos ya realizadas y reconsiderara el dictamen emitido.

Ante ello, el 20 de junio de 2025, el TPI emitió y notificó una *Resolución Interlocutoria* mediante la cual denegó la solicitud de la parte apelante.

Inconforme, el 18 de julio de 2025, la parte apelante presentó ante nos el recurso de *Apelación,* que nos ocupa, y señaló al foro primario por la comisión de los siguientes errores:[18]

> Primer error: Erró el Honorable Tribunal de Primera Instancia al no determinar que el demandado Dr. Aurelio García se apartó de los standards de la mejor práctica de la medicina al ordenar la admisión de una paciente que sufrió un infarto isquémico agudo cerebral a un centro que no tenía ni los especialistas ni lo recursos para tratar a esa paciente.

> Segundo error: Erró el Honorable Tribunal de Primera Instancia al determinar que el demandado Dr. Aurelio García no incurrió en negligencia médica cuando violó los propios protocolos del hospital y al nunca iniciar profilaxis para embolia, aún cuando el conocía que pacientes con diagnóstico de infarto isquémico agudo tienen una predisposición de hasta de un 80% de desarrollar embolia pulmonar.

El 23 de julio de 2025, la parte apelante presentó una *Moción Solicitando Autorización para Presentar Transcripción de la Prueba Oral,*[19] la cual declaramos *con lugar,* mediante *Resolución* emitida el 4 de agosto de 2025 y notificada el 5 de agosto de 2025.[20]

Tras varios trámites procesales, el 17 de octubre de 2025, la parte apelante presentó un *Alegato Suplementario,*[21] y, el 14 de noviembre de 2025, la parte apelada interpuso su *Alegato en Oposici[ó]n a Apelaci[ó]n.*[22]

Con el beneficio de la comparecencia de ambas partes, la transcripción de la prueba oral y el expediente que obran ante nos, procedemos a disponer del presente recurso, no sin antes delimitar la normativa jurídica aplicable.

---

[18] Entrada Núm. 1 del caso TA2025AP00148 en el SUMAC.
[19] Entrada Núm. 2 del caso TA2025AP00148 en el SUMAC.
[20] Entrada Núm. 3 del caso TA2025AP00148 en el SUMAC.
[21] Entrada Núm. 7 del caso TA2025AP00148 en el SUMAC.
[22] Entrada Núm. 13 del caso TA2025AP00148 en el SUMAC.

## II.

## A.

Una de las fuentes de las obligaciones son los actos y las omisiones en los que intervenga cualquier género de culpa o negligencia, está obligado a reparar el daño causado. Artículo 1042 del *Código Civil de Puerto Rico* de 1930, 31 LPRA ant. sec. 2992 (Código Civil).[23] El Artículo 1802 del Código Civil, *supra* ant. sec. 5141, establece, en lo pertinente, que "[e]l que por acción u omisión causa daño a otro, interviniendo culpa o negligencia, está obligado a reparar el daño causado." La culpa o negligencia consiste en "la falta de debido cuidado, que a la vez consiste en no anticipar y prever las consecuencias racionales de un acto, o de la omisión de un acto, que una persona prudente habría de prever en las mismas circunstancias". *López v. Porrata Doria*, 169 DPR 135, 151 (2006); *Toro Aponte v. ELA*, 142 DPR 464, 473 (1997).

Para que prospere una acción de daños y perjuicios, el reclamante debe establecer: (1) la existencia de un daño real; (2) el nexo causal entre el daño y la acción u omisión del demandado, y (3) el acto u omisión cual tiene que ser culposo o negligente. *Cruz Flores et al. v. Hosp. Ryder et al.*, 210 DPR 465, 483-484 (2022); *Pérez Hernández v. Lares Medical Center, Inc.*, 207 DPR 965, 976 (2021); *López v. Porrata Doria, supra*, pág. 150 (2006).

La culpa o negligencia consiste en la falta del debido cuidado, que a la vez consiste en no anticipar y prever las consecuencias racionales de un acto, o de la omisión de un acto, que una persona prudente habría de prever en las mismas circunstancias. *Mena*

---

[23] Debido a que los hechos que suscitaron la causa de acción de autos ocurrieron antes del 28 de noviembre de 2020, hacemos constar la aplicación del Código Civil de 1930, el cual fue derogado por la Ley Núm. 55-2020, también conocida como el *Código Civil de Puerto Rico de 2020*. Esta última pieza legislativa, en su Artículo 1815, establece, en lo pertinente, lo siguiente: "La responsabilidad extracontractual, tanto en su extensión como en su naturaleza, se determina por la ley vigente en el momento en que ocurrió el acto u omisión que da lugar a dicha responsabilidad." 31 LPRA sec. 11720. Por tanto, para propósitos del presente caso, se hará referencia a las disposiciones de la legislación derogada.

*Pamias v. Jiménez Meléndez,* 212 DPR 758, 768 (2023); véase, además, *Pérez Hernández v. Lares Medical Center, Inc.*, *supra*, págs. 976–977; *López v. Porrata Doria, supra*, pág. 151; *Toro Aponte v. ELA, supra*, pág. 473.

Ahora bien, entre el acto culposo y el daño sufrido debe existir un nexo causal adecuado. *Pérez Hernández v. Lares Medical Center, Inc.*, *supra*, pág. 977. El nexo causal adecuado no es "causa de toda condición sin la cual no se hubiera producido el resultado, sino la que ordinariamente lo produce, según la experiencia general". *Pérez Hernández v. Lares Medical Center, Inc.*, *supra*, págs. 976-977.

Así pues, una vez se imponga responsabilidad conforme a la normativa jurídica pormenorizada, se resarce al damnificado con un valor económico al daño sufrido. *Mena Pamias v. Jiménez Meléndez, supra*, pág. 769 (citando a *García Pagán v. Shiley Caribbean, etc.*, 122 DPR 193, 206 (1988).

**B.**

Es sabido que la responsabilidad de los médicos, por actuaciones u omisiones torticeras dentro del marco de su profesión, es de naturaleza subjetiva y extracontractual, de modo que las normativas antes expuestas derivadas del Artículo 1802 del Código Civil, *supra*, son de aplicación. *Martínez Marrero v. González Droz*, 180 DPR 579, 592 (2011). De modo que, para imponer responsabilidad civil a un médico por actos de mala práctica al amparo del referido artículo, es necesario que el demandante agraviado pruebe: (1) cuáles son las normas mínimas de conocimiento y de cuidado médico aplicables a los médicos generalistas y especialistas; (2) que el demandado no cumplió con dichas normas en el tratamiento del paciente; y (3) que ello fue la causa del daño sufrido. *Arrieta v. de la Vega*, 165 DPR 538, 549 (2005). Lo anterior implica que, para prosperar en una demanda en daños y perjuicios por impericia médica, es indispensable

demostrar, mediante preponderancia de la prueba, que la acción u omisión negligente del médico fue la causa que con mayor probabilidad ocasionó el daño y establecer, además, el vínculo causal que requiere el Artículo 1802 del Código Civil, *supra. Blas v. Hosp. Guadalupe*, 146 DPR 267, 322 (1998).

Sobre la norma mínima de cuidado exigible, se requiere que el médico brinde a sus pacientes aquella atención médica que, a la luz de los modernos medios de comunicación y de enseñanza, y conforme al estado de conocimiento de la ciencia y de la práctica prevaleciente en la medicina, satisface las exigencias generalmente reconocidas por la comunidad médica. *Arrieta v. de la Vega, supra*, pág. 549.

Nuestro Tribunal Supremo ha establecido que, en los casos sobre impericia médica profesional existe una presunción de corrección en el tratamiento brindado por el médico. *Íd.* Por tanto, el demandante debe derrotar la presunción y demostrar que el médico fue negligente y que su conducta negligente fue el factor que, con más probabilidad, causó los daños sufridos. *López v. Dr. Cañizares*, 163 DPR 119, 134-135 (2004). Como es sabido, "[l]a negligencia del médico, al igual que la de cualquier otra persona demandada al amparo del Art. 1802 del C[ó]digo Civil, supra, no se presume por el mero hecho de que el paciente haya sufrido un daño o que el tratamiento no haya tenido éxito." *Íd.*, pág. 135; *Rodríguez Crespo v. Hernández*, 121 DPR 639, 650 (1988). Igualmente, no basta con alegar una mera posibilidad de que el daño se debió al incumplimiento del médico con su obligación profesional para rebatir la presunción de corrección. *López v. Dr. Cañizares, supra*, pág. 135.

Asimismo, es preciso destacar que, al evaluar una acción en daños por impericia médica, el médico cuenta con una discreción para formular un juicio profesional en cuanto al diagnóstico y

tratamiento médico, a tenor con las circunstancias particulares e individuales de cada paciente. *Íd.*, pág. 134; *Ramos, Escobales v. García, González*, 134 DPR 969, 975 (1993). Es por ello por lo que "el médico no incurre en responsabilidad civil si el tratamiento que le brinda a su paciente, aun cuando erróneo, está enmarcado en los linderos de lo razonable y es aceptado por amplios sectores de la profesión médica." *López v. Dr. Cañizares, supra,* pág. 134. En ese sentido, "[e]l error de juicio honesto e informado cometido por un médico en el tratamiento de su paciente tampoco constituye fuente de su responsabilidad." *Íd.*

**C.**

Es sabido que los tribunales apelativos actúan como foros revisores. *Dávila Nieves v. Meléndez Marín*, 187 DPR 750, 770 (2013). Este Tribunal de Apelaciones tiene como tarea principal aplicar el derecho a los hechos particulares de cada caso. *Íd.* Dicha función, está cimentada en que el Tribunal de Primera Instancia haya desarrollado un expediente completo que incluya los hechos que haya determinado como ciertos ante la prueba que se haya ventilado. *Íd.* Como Tribunal de Apelaciones, no celebramos juicios plenarios, no presenciamos el testimonio oral de los testigos, no dirimimos la credibilidad y, tampoco esbozamos determinaciones de hechos. *Hernández Maldonado v. Taco Maker*, 181 DPR 281, 289 (2011).

Ante ello, los foros revisores no intervendrán con las determinaciones de hechos coaligadas por el Tribunal de Primera Instancia, la apreciación sobre credibilidad y valor probatorio de la prueba presentada en sala. *Dávila Nieves v. Meléndez Marín, supra,* pág. 771; *Hernández Maldonado v. Taco Maker, supra,* pág. 289.

Como excepción, en caso de que la actuación del juzgador de los hechos medió pasión, prejuicio, parcialidad o error manifiesto, este Tribunal de Apelaciones puede descartar las determinaciones

de los hechos. *Pueblo v. Millán Pacheco*, 182 DPR 595, 642 (2011) *Miranda Cruz y otros v. SLG Ritch*, 176 DPR 951, 974 (2009); *Soc. de Gananciales v. Centro Gráfico*, 144 DPR 952, 962 (1998). El Tribunal Supremo ha resuelto que, "si de un análisis de la totalidad de la evidencia este Tribunal queda convencido de que se cometió un error, como cuando las conclusiones están en conflicto con el balance más racional, justiciero y jurídico de la totalidad de la evidencia recibida, las consideraremos claramente erróneas". *Álvarez v. Rivera*, 165 DPR 1, 13 (2005); *Dávila Nieves v. Meléndez Marín, supra*, pág. 772 (citando a *Abudo Servera v. ATPR*, 105 DPR 728, 731 (1977)).

Ante una alegación de pasión, prejuicio o parcialidad, los foros apelativos debemos evaluar si el juez o la jueza cumplió su función judicial de adjudicar la controversia específica conforme a derecho y de manera imparcial, pues solo así podremos descansar con seguridad en sus determinaciones de hechos. *Dávila Nieves v. Meléndez Marín, supra*, pág. 777.

Ahora bien, las conclusiones de derecho son revisables en su totalidad por el Tribunal de Apelaciones. *Hernández Maldonado v. Taco Maker, supra*, pág. 289. De igual forma, la norma de deferencia judicial no aplicará a la evaluación de la prueba pericial y documental. Ello es así toda vez que, en cuanto a las conclusiones de hecho basadas en prueba pericial o documental, los foros judiciales apelativos se encuentran en igual posición que los foros de instancia para apreciarla, adoptar su propio criterio, e inclusive, descartarla aunque sea técnicamente correcta. *González Hernández v. González Hernández*, 181 DPR 746, 777 (2011); *Arrieta v. de la Vega, supra*, pág. 551.

Sobre el valor probatorio que les correspondan los tribunales a los testimonios periciales, la Regla 702 de Evidencia, 32 LPRA Ap. VI, dispone lo siguiente:

> Cuando conocimiento científico, técnico o especializado sea de ayuda para la juzgadora o el juzgador poder entender la prueba o determinar un hecho en controversia una persona testigo capacitada como perita —conforme a la Regla 703— podrá testificar en forma de opiniones o de otra manera.
>
> El valor probatorio del testimonio dependerá, entre otros, de:
>
> (a) Si el testimonio está basado en hechos o información suficiente;
>
> (b) si el testimonio es el producto de principios y métodos confiables;
>
> (c) si la persona testigo aplicó los principios y métodos de manera confiable a los hechos del caso;
>
> (d) si el principio subyacente al testimonio ha sido aceptado generalmente en la comunidad científica;
>
> (e) las calificaciones o credenciales de la persona testigo, y
>
> (f) la parcialidad de la persona testigo.

Por otra parte, en cuanto a la capacidad de los testigos peritos, la Regla 703 de Evidencia, *supra*, dispone que:

> (a) Toda persona está calificada para declarar como testigo pericial si posee especial conocimiento, destreza, experiencia, adiestramiento o instrucción suficiente para calificarla como experta o perita en el asunto sobre el cual habrá de prestar testimonio. Si hubiere objeción de parte, dicho especial conocimiento, destreza, adiestramiento o instrucción deberá ser probado antes de que la persona testigo pueda declarar como perita.
>
> (b) El especial conocimiento, destreza, experiencia, adiestramiento o instrucción de una persona que es testigo pericial podrá ser probado por cualquier evidencia admisible, incluyendo su propio testimonio.
>
> (c) La estipulación sobre la calificación de una persona perita no es impedimento para que las partes puedan presentar prueba sobre el valor probatorio del testimonio pericial.

**III.**

En el presente caso, la parte apelante argumentó que el TPI cometió dos (2) errores sobre la apreciación que le mereció la prueba que tuvo ante sí, y por la cual determinó que la causa de acción interpuesta por impericia médica no procedía. Por estar íntimamente relacionados entre sí, discutiremos ambos señalamientos de error conjuntamente.

Conforme las normas jurídicas pormenorizadas, se reconoce que los médicos cuentan con una discreción inherente para formular un juicio profesional en cuanto al diagnóstico y tratamiento médico que determine procedente, de conformidad con las características y circunstancias particulares e individuales de cada paciente. *López v. Dr. Cañizares, supra*, pág. 134; *Ramos, Escobales v. García, González, supra*, pág. 975. "[E]l médico no incurre en responsabilidad civil si el tratamiento que le brinda a su paciente, aun cuando erróneo, está enmarcado en los linderos de lo razonable y es aceptado por amplios sectores de la profesión médica." *López v. Dr. Cañizares, supra*, pág. 134.

En adición, los médicos gozan con una presunción de corrección en el tratamiento que brindan. *Arrieta v. de la Vega, supra*, pág. 549. Consecuentemente, le corresponde a quien impugna dicho tratamiento derrotar la presunción y probar que el médico se apartó de las normas de cuidado exigidas por su profesión. *López v. Dr. Cañizares, supra*, págs. 134-135. En ese sentido, un análisis concienzudo e independiente de la prueba pericial ante nuestra consideración nos convence de que no erró el TPI al determinar que la parte apelante no derrotó la presunción de corrección en el tratamiento que brindó el doctor García Medina y, por ende, no probó que este incurrió en impericia profesional.

Al contrario, la prueba pericial y documental que obra ante nos, sobre la cual nos encontramos en igual posición que el foro primario para apreciarlas y aquilatar su valor probatorio, *González Hernández v. González Hernández, supra*, pág. 777, refleja que la parte apelada cumplió con las normas mínimas de cuidado exigidas por la profesión médica.

Ahora bien, tras un análisis cuidadoso del expediente ante nuestra consideración y evaluada la prueba oral concurrimos con la determinación del *foro a quo*.

En primer lugar, ambos peritos de la parte apelante, el doctor Schenk Aldahondo, perito neurólogo, y el doctor Quiles Lugo, perito en medicina interna y cardiología, coincidieron en que la señora Rivera Espada debió haber recibido tratamiento en un centro especializado en infartos cerebrovasculares o *stroke center*. En ese sentido, opinaron que las limitaciones y ausencia en las herramientas disponibles para el cuidado y el tratamiento de infartos cerebrovasculares contribuyó a que no se le pudiera brindar un tratamiento adecuado.

Sin embargo, surge del testimonio del doctor Schenk Aldahondo que este reconoció que, en el área sur de Puerto Rico, para la fecha en que ocurrieron los hechos, no existían *stroke centers*. Asimismo, que el *stroke center* más cercano al Hospital San Cristóbal era en Caguas, aproximadamente a más de una (1) hora de distancia.[24] En adición, el doctor Quiles Lugo admitió que, como regla general, cuando se recibe a un paciente que sufrió un derrame cerebral, a través de la sala de emergencia, su traslado de un hospital a otro se coordina entre las salas de emergencia de ambas instituciones, y señaló que ello no fue realizado por la doctora Martínez Ortiz.[25]

Por su lado, el doctor Rivera Ramos, perito de la parte apelante, testificó, similar al doctor Quiles Lugo, tras indicar que le corresponde al médico de sala de emergencias la responsabilidad de decidir sobre el traslado de los pacientes que recibe, a una institución con los servicios médicos que necesiten, tomando como base el diagnóstico inicial que confirme.[26] De hecho, añadió que el médico internista, como lo es la parte apelada, ni siquiera se entera

---

[24] Transcripción de la prueba oral (TPO), 17 de marzo de 2025, págs. 86 y 87, líneas 24-25 y 1-6.
[25] *Íd.*, 12 de marzo de 2025, págs. 59 y 60, líneas 23-25 y 1-7.
[26] TPO, 24 de marzo de 2025, págs. 66 y 67, líneas 18-25 y 1-4.

de aquellos pacientes que se reciben en la sala de emergencias y, de allí, fueron trasladados.[27]

De entrada, no albergamos duda de que, en casos de pacientes con infartos cerebrovasculares, el tratamiento en los *stroke centers* resulta más beneficioso toda vez que, por razones obvias, cuentan con el personal adiestrado y las herramientas diseñadas específicamente para el cuidado de pacientes con derrame cerebral.

No obstante, no atisbamos error en el proceder del foro primario tras determinar que la admisión de la señora Rivera Espada al Hospital San Cristóbal, el cual no contaba con un *stroke center* para tratarla, en las circunstancias particulares del caso de autos, no constituyó una acción negligente por la cual se le debía imputar responsabilidad al Doctor García Medina. Igualmente, colegimos que no ordenar el traslado de la señora Rivera Espada al *stroke center* más cercano no constituyó una omisión negligente por la que se le deba sujetar a la parte apelada a responsabilidad civil ante el riesgo que había en ordenar el traslado de la señora Rivera Espada a Caguas.

Los testimonios de ambos peritos de la parte apelante revelan que el Doctor García Medina no incurrió en acciones u omisiones que denotaran impericia profesional por haber admitido a la señora Rivera Espada. De hecho, el Doctor Quiles Lugo manifestó que, generalmente, le competía al facultativo en la sala de emergencias ordenar y coordinar el traslado de un paciente a otra sala de emergencias u hospital. Asimismo, el Doctor Schenk Aldahondo indicó que los pacientes que sufren *strokes* cerebrovasculares en el área sur de Puerto Rico terminan siendo atendidos en hospitales de dicha área.

---

[27] *Íd.*, pág. 67, líneas 2-4.

De igual forma, resaltamos que, en su informe pericial, el Doctor Rivera Ramos constó que, dadas las lamentables fragilidades en el sistema hospitalario puertorriqueño, es una práctica común fuera del área metropolitana que los médicos internistas sean quienes atiendan diariamente a pacientes con accidentes cerebrovasculares, así como con otras afecciones que requieran tratamiento sumamente especializado. Consecuentemente, no se cometió el primer error.

En segundo lugar, la parte apelante arguyó que, la parte apelada fue negligente al violar los protocolos del Hospital San Cristóbal tras no responder por escrito la consulta médica que se le realizó y al no iniciar un tratamiento de profilaxis tromboembólica.

Con respecto a la consulta médica que contestó el Doctor García Medina, la parte apelante aduce que la contestación debió haberse hecho por escrito. Sin embargo, lo cierto es que la Doctora Martínez Ortiz, quien atendió a la señora Rivera Espada en la sala de emergencias, nunca realizó la consulta por escrito, sino que la gestionó por teléfono.

De hecho, surge del récord médico, en las notas tomadas por la Doctora Martínez Ortiz en la sala de emergencias, que intentó comunicarse con el Doctor García Medina y le dejó un mensaje aproximadamente, a las 7:39 p.m. del 31 de agosto de 2020.[28] Asimismo, surge que, ese mismo día, aproximadamente a las 8:30 p.m., la Doctora Martínez Ortiz constó en sus notas que se comunicó con la parte apelada, por la vía telefónica, nuevamente, quien ordenó admitir a la señora Rivera Espada y a realizársele una serie de estudios y tratamientos farmacológicos.[29] Consecuentemente, al doctor García Medina no se le realizó ninguna consulta médica por

---

[28] Entrada Núm. 127 del caso PO2021CV01907 en el SUMAC, Exhibit II, pág. 65.
[29] Entrada Núm. 27 del caso PO2021CV01907 en el SUMAC, *informe pericial del doctor Schenk Aldahondo,* pág. 64. Admitido en evidencia como Exhibit 1 de la parte apelante.

escrito para contestar. Más bien, se le realizó la consulta por teléfono, la cual, efectivamente y por el mismo medio, la contestó.

Por otro lado, la parte apelante adujo que, al no iniciar la profilaxis, la parte apelada se apartó de las normas de su buena práctica.

Tal como hemos esbozado, nos remitimos a los informes y testimonios periciales de los doctores Schenk Aldahondo y Rivera Ramos, quienes fueron los únicos peritos en neurología. El Doctor Schenk Aldahondo opinó que la señora Rivera Espada debió recibir medicamente un trombolítico, dentro de las primeras tres (3) a cuatro (4) horas y media desde el accidente cerebrovascular. Sin embargo, durante el juicio en su fondo, admitió que no le atribuía al doctor García Medina la responsabilidad de la omisión.[30]

Asimismo, admitió que, ante la situación de un paciente con un infarto significativo en una arteria principal, la administración de un anticoagulante conlleva el riesgo de que el infarto se torne hemorrágico.[31] A esos fines, reconoció que le corresponde al médico, en su juicio clínico, determinar, sopesando todas las posibilidades, si ordena el anticoagulante y que, en el presente caso, el doctor Garcia Medina optó por no hacerlo.[32] Igualmente, con relación a la posibilidad de que la profilaxis trombolítica fuera atendida mediante medias de compresión, el doctor Schenk Aldahondo reconoció que las guías de tratamiento de pacientes con *stroke* no especifican el tiempo dentro del cual debe ser ordenado el uso de estas.[33]

Es preciso hacer referencia, a lo constado por el doctor Rivera Ramos en su informe pericial. En específico, opinó, y citamos, que:

> [L]a administración del medicamento trombolítico (tPA) NO es una alternativa disponible en [el Hospital San Cristóbal] ni tampoco en los hospitales cercanos del área sur de Puerto Rico. No es sensato pretender administrar un tratamiento complejo, especializado y altamente riesgoso cuando no se tiene la experiencia requerida para hacerlo[.] El doctor

---

[30] TPO, 7 de marzo de 2025, pág. 78, líneas 3-13.
[31] *Íd.*, págs. 79 y 80, líneas 9-25 y 1-3.
[32] *Íd.*, pág. 80, líneas 4-22.
[33] TPO, 7 de marzo de 2025, pág. 81, líneas 12-18.

Aurelio García NO era responsable de considerar tratamiento de trombolítico y además advino en conocimiento de la consulta a las 8:31 PM cuando ya había pasado la oportunidad de hacerlo.

[…]

El Dr. Aurelio García deliberadamente evitó el uso del anticoagulante *enoxaparin* utilizado para este propósito debido al tamaño grande del infarto cerebral, lo cual implica un riesgo aumentado de transformación hemorrágica que podría ser agravado por la utilización de anticoagulantes. Es práctica común y avalada por expertos en manejo de stroke que en los infartos cerebrales grandes se evite el uso de anticoagulantes por l[o]s primeros 3-5 días para evitar complicaciones hemorrágicas. Una vez p[a]sa este per[í][o]do y no hay evidencia de sangrado en estudios de imágenes de seguimiento, se comienza el tratamiento preventivo de manera segura.

[…]

Las guías no especif[i]can un tiempo prec[i]so para implementar el uso de las medias o anticoagulantes. En la práctica clínica de stroke se inicia alguna profilaxis en las primeras 48 horas de admisión al hospital luego de haber descartado contraindicaciones. El deterioro clínico de la paciente de manera súbita ind[i]ca condición aguda severa y es altamente probable que hubiese ocurrido independientemente de la utilización de medias neumáticas de compresión.[34]

De conformidad con lo anterior, es forzoso concluir que, de la propia prueba pericial, tanto la provista por el Doctor Schenk Aldahondo, como por el Doctor Rivera Ramos, se estableció razonablemente que las decisiones del Doctor García Medina, en cuanto al tratamiento de profilaxis, se circunscribió a su discreción clínica. Nótese que, el informe pericial del Doctor Rivera Ramos y el testimonio pericial del Doctor Schenk Aldahondo coinciden en cuanto a los riesgos del anticoagulante en pacientes con pronósticos similares al de la señora Rivera Espada, lo que reitera la conclusión de que la decisión de la parte apelada fue basada en su juicio clínico discrecional.

Ciertamente, la pérdida que provocó la presente acción judicial es un suceso lamentable, sobre el cual constatamos nuestra empatía y solidaridad para con la parte apelante. No obstante, tras

---

[34] Entrada Núm. 126 del caso PO2025CV01907 en el SUMAC, *informe pericial del doctor Rivera Ramos*, págs. 8, 11 y 13 (énfasis suprimido) (bastardillas en el original). Admitido en evidencia como Exhibit 1 de la parte apelada.

ponderar la totalidad del expediente ante nos, no encontramos algún error en la *Sentencia* apelada sobre lo cual colijamos que proceda su revocación, por lo que determinamos confirmar el dictamen.

**IV.**

Por los fundamentos que anteceden, confirmamos la *Sentencia* apelada.

Notifíquese.

Lo acuerda el Tribunal, y lo certifica la Secretaria del Tribunal de Apelaciones.

Lcda. Lilia M. Oquendo Solís
Secretaria del Tribunal de Apelaciones